LOUISIANA MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM and The R.W. Grand Lodge of Free & Accepted Masons of Pennsylvania, on behalf of themselves and all other similarly situated shareholders of Caremark Rx, Inc., Plaintiffs,

v.

Edwin M. CRAWFORD; C.A. Lance Piccolo; Edwin M. Banks; C. David Brown, II; Colleen Conway–Welch; Harris Diamond; Edward L. Hardin, Jr.; Kristen E. Gibney–Williams; Roger L. Headrick; Jean–Pierre Millon; Michael D. Ware; Caremark Rx, Inc. and CVS Corporation, Defendants.

Express Scripts, Inc., a Delaware corporation; KEW Corp., a Delaware corporation and Skadden, Arps, Slate, Meagher & Flom, LLP, a Delaware Limited Liability Partnership, Plaintiffs,

v.

Edward M. Crawford; Edwin M. Banks; C. David Brown, II; Colleen Conway–Welch; Harris Diamond; Kristen E. Gibney–Williams; Edward L. Hardin, Jr.; Roger L. Headrick; Jean–Pierre Millon; C.A. Lance Piccolo; Michael D. Ware; Caremark RX, Inc., a Delaware corporation; CVS Corporation, a Delaware corporation; and AdvancePCS, a Delaware corporation, Defendants.

C.A. Nos. 2635–N, 2663–N.

Court of Chancery of Delaware, New Castle County.

Submitted: Feb. 16, 2007.
Decided: Feb. 23, 2007.

Stuart M. Grant, Michael J. Barry, Stephen G. Grygiel and James P. McEvilly, of Grant & Eisenhofer, P.A., Wilmington, DE; Gerald H. Silk, Salvatore J. Graziano, Elliott J. Weiss, Mark Lebovitch, Brett M. Middleton and Noam Mandel, of Bernstein Litowitz Berger & Grossmann, LLP, New York City, of counsel, for Plaintiffs Louisiana Municipal Police Employees' Retirement System and The R.W. Grand Lodge of Free & Accepted Masons of Pennsylvania.

David C. McBride, Richard H. Morse, Bruce L. Silverstein, C. Barr Flinn, Rolin P. Bissell, James P. Hughes, Jr., John T. Dorsey, Christian Douglas Wright, John J. Paschetto, Elena C. Norman, Adam W. Poff, Dawn M. Jones, Michael W. McDermott, Andrew A. Lundgren, D. Fon Muttamara–Walker, Mary F. Dugan, Karen Lantz, Kristen Salvatore DePalma, Chad S.C. Stover and Jeffrey T. Castellano, of Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, for Plaintiffs Express Scripts, Inc. and KEW Corp.

William M. Lafferty, R. Judson Scaggs, Jr., Thomas W. Briggs, Jr., John P. DiTomo, William E. Green, Jr. and Amaryah Kishpaugh, of Morris, Nichols, Arsht & Tunnell, LLP, Wilmington, DE; M. Robert Thornton, B. Warren Pope and Michael J. Cates, of King & Spalding, LLP, Atlanta, GA; Eric M. Roth, David Gruenstein, George T. Conway III, Jonathan E. Pickhardt, Jeffrey C. Fourmaux and Graham W. Meli, of Wachtell, Lipton, Rosen & Katz, New York City, of counsel, for Defendants the Caremark Directors; Kevin G. Abrams, of Abrams & Laster, LLP, Wilmington, DE, for Defendants Caremark Rx, Inc. and AdvancePCS.

Allen M. Terrell, Jr., Lisa A. Schmidt, Richard P. Rollo, Charles A. McCauley, III, Harry Tashjian, IV and Megan R. Wischmeier, of Richards, Layton & Finger, P.A., Wilmington, DE; Lawrence Portnoy, Thomas P. Ogden and Eric Halper, of Davis Polk & Wardwell, New York City, of counsel, for Defendant CVS Corporation.

## *OPINION*

CHANDLER, Chancellor.

Delaware courts place great faith in the discernment and acumen of shareholders and directors. Only in extraordinary circumstances will this Court substitute its business judgment for that of directors, or usurp the rights of shareholders to make their own informed decisions. When, as here, plaintiffs seek to prevent shareholders from making a fundamental decision, they bear a heavy burden to persuade the Court that shareholders are somehow unable to provide for their own protection, or that effective use of the corporate franchise is barred by some critical lack of information. Plaintiffs seek to enjoin a

merger already agreed between two boards of directors and ready to be put to shareholders. Although plaintiffs allege facts concerning the process by which the deal was negotiated that trouble the Court, very few of their arguments suggest that I am in a better position than Caremark's shareholders to make the ultimate decision.

## I. STATEMENT OF FACTS

### A. The Parties

Shareholders are represented by two named plaintiffs, one private and one public. Plaintiff Louisiana Municipal Police Employees' Retirement System ("LAMPERS"), an entity created by enabling legislation passed by the Louisiana State Legislature in 1973, provides retirement allowances and other benefits for full-time municipal police officers and employees in the State of Louisiana, secretaries to chiefs of police and employees of LAMPERS. LAMPERS' fellow plaintiff, The R.W. Grand Lodge of Free & Accepted Masons of Pennsylvania ("Masons"), an entity with approximately $500 million in assets, is part of the oldest and largest fraternity of freemasons in the world. Both plaintiffs have been shareholders at all material times in this transaction.[1]

Plaintiff Express Scripts, Inc. is a Delaware corporation with its principal place of business in St. Louis, Missouri. Express Scripts is one of the largest pharmacy benefit manager companies in North America, providing pharmacy benefit services to thousands of client groups, including managed-care organizations, insurance carriers, employers, third-party adminis-

trators, and public sector and union-sponsored benefit plans. Plaintiff KEW Corp., a Delaware corporation and Caremark stockholder, is a wholly-owned subsidiary of Express Scripts.[2] KEW currently owns at least 591,180 Caremark shares, all purchased on or after December 13, 2006.

Plaintiff Skadden, Arps, Slate, Meagher & Flom LLP, a leading international law firm with offices in, among other places, Wilmington, Delaware and New York City, is a Delaware limited liability partnership.

Defendant Caremark Rx, Inc. is a Delaware corporation, headquartered in Nashville and founded in 1993. A leading pharmaceutical benefits management ("PBM") company, Caremark provides comprehensive drug benefit services through its affiliates to over 2,000 health plans and their plan participants throughout the country. Defendant AdvancePCS, a Delaware corporation, is a wholly-owned subsidiary of Caremark.

Edwin M. Crawford, Edwin M. Banks, C. David Brown, II, Colleen Conway–Welch, Harris Diamond, Kristen E. Gibney–Williams, Edward L. Hardin, Jr., Roger L. Headrick, Jean–Pierre Millon, C.A. Lance Piccolo, and Michael D. Ware are members of the board of directors of Caremark. Crawford serves as Chairman and Chief Executive Officer. These directors are also defendants in a separate action filed in Tennessee, alleging that they breached their fiduciary duties by approving and/or benefiting from improperly backdated stock options.[3]

Defendant CVS Corporation ("CVS"), a Delaware corporation with its principal place of business in Rhode Island, is

---

**1.** For the sake of expediency, all references to plaintiff LAMPERS in this Opinion include the Masons, unless otherwise noted.

**2.** For the sake of expediency, all references to plaintiff Express Scripts in this Opinion include KEW, unless otherwise noted.

**3.** *In re Caremark, Rx., Inc. Derivative Litig.,* Master Docket No. 3:06–cv–00535 (M.D.Tenn.).

America's largest retail pharmacy. CVS operates approximately 6,200 retail and specialty pharmacy stores in forty-three states and the District of Columbia.

### B. Factual Background

#### 1. Preliminary negotiations

Because Caremark is an intermediary between pharmaceutical companies and health plans, it always confronts the traditional fear of the middleman: being cut out. Thus, Caremark management has long sought strategic combinations that would ensure Caremark's continued profit growth. To this end, Caremark hired William Spaulding, a former mergers and acquisitions attorney who had assisted Caremark in its acquisition of AdvancePCS, in June 2005. Between May and October 2005, Caremark and Express Scripts entered into preliminary discussions regarding a possible merger, but negotiations were dropped after Express Scripts issued a disappointing earnings announcement. Around the same time, Crawford and Thomas M. Ryan, Chairman and CEO of CVS, began to discuss the strategic advantages of a vertical merger between their two firms. From the outset, Caremark and CVS have envisioned any potential transaction between the two companies as a no-premium "merger of equals"—a stock-for-stock merger in which neither side would be perceived as the acquiror, the combined entity would be owned in nearly equal proportion by its current shareholders, the combined entity's board would have equal representation, and the management teams from each company would continue to run their respective businesses. Both parties retained invest-ment advisors to study the strategic rationale behind this investment, entered into a confidentiality agreement, and began to assess potential synergies that might exist between the two parties. Discussions broke off in March 2006, but resumed in August.[4]

On August 16, 2006, Caremark's management met with the board to review strategic opportunities for Caremark, including a discussion of potential acquisitions or combinations with retail pharmacy chains, diagnostic companies, and health care information technology companies. The presentation included potential "game changer" strategic transactions, other significant transactions, and an array of smaller tactical deals. Management suggested, and the board agreed, that a potential business combination with a retail drugstore chain offered both strategic and financial opportunities for the company. A transaction with another PBM, on the other hand, was deemed to have the lowest strategic impact, although there might be some material upside depending upon the particular PBM partner. Management identified CVS as a strong potential merger partner in the event the board decided to pursue the former strategy. The meeting ended with the board instructing management to concentrate on a strategic transaction.

#### 2. The CVS/Caremark Merger Agreement

Negotiations then resumed between Caremark and CVS. The Caremark board met, either via telephone or in person, four times in October 2006 to consider various aspects of a Caremark/CVS merger.[5] As a

---

**4.** The parties disagree as to the cause of the May–August 2006 hiatus in negotiations. Defendants insist that CVS needed the time to focus on implementing the acquisition of another drugstore chain. Plaintiffs suggest that the hesitation was due to an investigation into stock options backdating conducted by the U.S. Department of Justice and the SEC. As my decision does not turn upon the issue, it need not be considered here.

**5.** On October 9, 2006, Crawford also met with David Snow, CEO of Medco (a Caremark competitor), at Snow's behest, to talk about

result of those negotiations, the boards of Caremark and CVS entered into a merger agreement, subject to the approval of the shareholders of both companies, on November 1, 2006. By the terms of this agreement, Caremark shareholders would own approximately 45% of the combined company, having received 1.67 shares of CVS stock for every share of Caremark stock owned. Neither party would receive a premium. The board of directors would be evenly split between Caremark and CVS shareholders, and management positions would be divided between the two companies. Crawford would serve as Chairman of the combined company, while Ryan would remain as CEO.

■ Whatever the merger's strategic significance, many Caremark directors and managers stand to benefit handsomely from this agreement, whether or not they remain employed by the combined entity. The merger will constitute a "change of control" for purposes of most of Caremark's senior executive employment contracts and many, if not most, such employees will find that their outstanding Caremark options become immediately exercisable at the time of the merger.[6] Caremark's deferred compensation plan for outside directors, designed to pay out ordinarily upon a director's cessation of employment, pays out immediately after the "change of control." Crawford alone gains over $14 million from accelerated realization of options, while Hardin may receive over $2 million. Crawford stands to receive an additional "severance" payment ranging somewhere between $36 million and $40 million, although he has generously agreed to accept a mere $26.4 million "as an indication of his commitment to the merger and his confidence in the long-term economic benefits to be derived" therefrom.[7] Finally, the merger protects Caremark directors and executives from possible liability for option backdating in three ways. First, the new entity will contractually

possible strategic opportunities, but Crawford rejected such overtures due to his concern regarding anti-trust issues.

6. Even defendants such as Crawford, who will retain substantial authority as Chairman, benefit from this "change of control" acceleration of their options. Defendants insist that this "merger of equals" does not, however, constitute a corporate change of control for purposes of this Court's jurisprudence under *Revlon Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1986). This brings to mind Lewis Carroll's Humpty Dumpty, who made a similar assertion when he claimed that "[w]hen I use a word ... it means just what I choose it to mean—neither more nor less." When Alice asks whether he can truly make a word hold so many meanings, Humpty Dumpty quickly explains: "The question is ... which is to be master—that's all." Lewis Carroll, *Through the Looking Glass* (1871).

The Caremark directors' assertion of mastery has a very *Through the Looking Glass* feel to it. Certainly words may change in legal significance depending upon their context, and the Court realizes that the practical effect of invoking *Revlon* duties when directors receive "change of control" payments will be to inspire the drafters of executive employment contracts to simply rename this particular class of remuneration. It is an unfortunate and disappointing spectacle, however, to watch a board of directors insist that it simultaneously deserves the protection of the business judgment rule because the company is not changing hands, while a massive personal windfall is bestowed because it is. As Alice's cantankerous egg puts it, "When I make a word do a lot of work like that ... I always pay it extra." *Id.*

7. Opening Br. of LAMPERS in Supp. of Pls.' Mot. for Prelim. Inj. Ex. 5 at 88 [hereinafter Am. Proxy]. Presumably, Crawford will not be so generous to shareholders if he is asked to exercise his authority following a different merger that implicates his change of control rights. In practical effect, Crawford is unilaterally increasing the termination fee facing Caremark's shareholders by approximately $10 million.

honor any grant of options awarded by Caremark, whether or not it is later found to have been granted in violation of the Caremark board's fiduciary duties. Second, the combined company will indemnify all past and present directors of Caremark *either* "to the same extent such individuals are indemnified pursuant to Caremark's certificate of incorporation and bylaws in effect as of the date of the merger agreement" *or* "to the fullest extent permitted by law."[8] Finally, the merger may eliminate the standing of derivative plaintiffs in certain ongoing backdating lawsuits.

Whether the boards of Caremark and CVS were attempting to secure a merger of equals that offers considerable strategic benefit or protecting personal benefits that would flow from the merger, they made certain that the transaction contained a full complement of deal-protection devices. First, both boards are contractually bound to submit the merger to their shareholders under a "force the vote" provision. Second, both boards are subject to a "no shop" provision, under which neither board may speak with a competing bidder unless the board concludes, after examining a competing offer, that the offer either is a "Superior Proposal" or is likely to lead to one.[9] A "last look" provision obligates the target board to disclose the terms of a competing Superior Proposal, and allows the other party a five-day window in which to match the bid.

The foundation of this intricate barricade, however, is undoubtedly the $675 million reciprocal termination fee, a provision inseparably linked with the other deal

---

8. *Id.* at 94. That the indemnification is not merely coterminous with Caremark's former indemnification, but spans "the fullest extent permitted by law," may be quietly critical. A corporation may only indemnify its *own* directors to the extent that a director acts in good faith and in the best interests of the corporation and, therefore, may not eliminate or limit the liability of a director who acts in violation of their duty of loyalty. *See* 8 *Del. C.* § 102(b)(7); § 145. Indemnity owed to former Caremark directors from CVS/Caremark, however, arguably arises under contract law and outside the restrictions of statutory corporate law. In effect, CVS shareholders are offering to indemnify Caremark directors. Were a backdating case later to come to trial, Caremark directors would almost certainly argue that Delaware statutory law puts no direct limitation on such beneficence.

Expanded indemnification may be more important for independent directors when they are subject to claims for backdating of executive stock options. Directors who approve backdated options risk potential liability for damages when they have received no corresponding benefit. *See In re Tyson Foods, Inc. Consol. S'holder Litig*, 2007 WL 416132, at \*18 n. 72 (Del.Ch. Feb. 6, 2007). Such directors may face considerable personal loss if found liable, making indemnification that much more important to them, although in most cases the recipient of any ill-gotten gains will also be liable, if not under a theory of breach of fiduciary duty, then for unjust enrichment. *Cf. In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096 (Del.Ch.2003).

9. The merger agreement defines a Superior Proposal as:

> [A] bona fide, unsolicited written acquisition proposal ... for at least a majority of the outstanding shares of common stock of Caremark or CVS ... on terms that the board of directors of such party determines in good faith by a majority vote, after consultation with its legal and financial advisors and taking into account such matters deemed relevant in good faith by such board of directors, including among other things, all the terms and conditions of the acquisition proposal, including any break-up fees, expense reimbursement provisions, conditions to completion and long-term strategic considerations, are more favorable from a financial point of view to the stockholders of such party than the merger and for which financing, if a cash transaction (whether in whole or in part), is then fully committed or reasonably determined to be available by the board of directors of that party.

Am. Proxy at 111.

protection devices. The termination fee is triggered if, for almost any reason, either board withdraws or changes its recommendation of the merger. The fee must also be paid if either company's shareholders reject the merger agreement and then accept any *other* merger proposal within twelve months.

 The "no shop" provision contains what defendants characterize as a road map by which a competing bidder may tiptoe around termination fee landmines in order to make a hostile offer. The map looks like this: a target board must receive an offer and determine that it consti-

tutes, or may lead to, a Superior Proposal. The hostile bidder must also enter into a confidentiality agreement no less demanding than the one between CVS and Caremark. If, after providing its initial partner with a "last look" at the offer, the target board still wishes to change its recommendation, then the target board and the new party may enter into a conditional merger agreement. This new agreement is "conditional" because it may only become effective after: (a) the CVS/Caremark merger is terminated, *e.g.*, by shareholder vote; and (b) the third party pays the jilted suitor a $675 million consolation prize.[10]

10. The parties make passionate arguments with respect to the appropriateness of the deal protections. Defendants maintain that these are no more than a customary set of devices employed regularly by market participants and their lawyers. Particularly with respect to the termination fee, this argument by custom fails to convince.

It is true, as defendants note, that this Court has upheld termination fees of greater than three percent of total deal value. *See, e.g., McMillan v. Intercargo Corp.*, 768 A.2d 492, 505–06 (Del.Ch.2000) (describing 3.5% lockup as an "insubstantial obstacle"); *Lewis v. Leaseway Transp. Corp.*, 1990 WL 67383, at *8 (Del.Ch. May 16, 1990) (dismissing challenge to a transaction that included a breakup fee and related expenses of approximately 3% of transaction value); *Kysor Indus. Corp. v. Margaux, Inc.*, 674 A.2d 889, 897 (Del.Super.1996) (finding termination fee of 2.8% of Kysor's offer reasonable); *Goodwin v. Live Entm't*, 1999 WL 64265, at *20 (Del.Ch. Jan. 25, 1999) (approving termination fee of 3.125% *plus* $1 million in expenses for a total percentage of 4.167%). Defendants also pluck particular language from opinions in order to suggest that a three percent fee is somehow *presumptively* reasonable. *See, e.g., In re Pennaco Energy, Inc.*, 787 A.2d 691, 702 (Del.Ch.2001) ("settled on a termination fee at the more traditional level of 3%"); *id.* at 707 ("only the modest and reasonable advantages of a 3% termination fee and matching rights"); *McMillan*, 768 A.2d at 505–06 ("Although in purely percentage terms, the termination fee was at the high end of what our courts have approved, it was still within the range that is generally considered reason-

able.... From a preclusion perspective, it is difficult to see how a 3.5% fee would have deterred a rival bidder....").

Defendants attempt to build a bright line rule upon treacherous foundations, relying upon carefully-selected comments to contradict a clear principle of Delaware law. Our courts do not "presume that all business circumstances are identical or that there is any naturally occurring rate of deal protection, the deficit or excess of which will be less than economically optimal." *In re Toys "R" Us, Inc., S'holder Litig.*, 877 A.2d 975, 1016 (2005). Rather, a court focuses upon "the real world risks and prospects confronting [directors] when they agreed to the deal protections." *Id.* That analysis will, by necessity, require the Court to consider a number of factors, including without limitation: the overall size of the termination fee, as well as its percentage value; the benefit to shareholders, including a premium (if any) that directors seek to protect; the absolute size of the transaction, as well as the relative size of the partners to the merger; the degree to which a counterparty found such protections to be crucial to the deal, bearing in mind differences in bargaining power; and the preclusive or coercive power of *all* deal protections included in a transaction, taken as a whole. The inquiry, by its very nature fact intensive, cannot be reduced to a mathematical equation. Though a "3% rule" for termination fees might be convenient for transaction planners, it is simply too blunt an instrument, too subject to abuse, for this Court to bless as a blanket rule.

3. Express Scripts makes an unsolicited offer

These deal protection provisions became immediately relevant on December 18, 2006, when Express Scripts announced an unsolicited bid for Caremark. Under the Express Scripts offer, Caremark stockholders would receive $29.25 in cash and 0.426 shares of Express Scripts stock for each share of Caremark stock they owned. Based upon the market price of Express Scripts' stock on December 15, 2006, this represented a premium of approximately 22% over the average closing price of Caremark stock during the period from announcement of the CVS Merger until December 15, 2006, just before the Express Offer. The Express Offer valued Caremark at approximately $26 billion— over $3 billion more than the value under the CVS transaction at that time. But Express Scripts' proposal was conditioned on a due diligence review, antitrust approval, termination of the CVS merger agreement, and numerous other requirements. Express Scripts issued a press release providing details of the offer on the same day.

The CVS/Caremark merger passed a significant milestone before the Caremark board made any announcement with respect to the Express Scripts offer. December 20, 2006, the deadline for the Federal Trade Commission to issue a Request for Additional Information (commonly called a "second request") under the Hart Scott Rodino Act, passed uneventfully, clearing the way for defendants to proceed.

Between December 18, 2006 and January 3, 2007, Caremark's board met a number of times to consider the Express Scripts offer. The board consulted with legal and financial advisors, although much of the content of these discussions has been shielded from the Court and opposing parties through the invocation of privilege. Defendants argue, and have argued publicly, that Express Scripts' offer is deficient in a number of ways. First, Caremark insists that its board is determined to pursue a vertical merger as a matter of corporate strategy, having rejected a horizontal merger as failing to address the disintermediation challenges identified by management. Second, defendants point to a number of clients who, according to Caremark, are reluctant to work with Express Scripts, and might leave if a merger were consummated. This risk raises doubts to the board as to the synergies that could be exploited by the merged company. Third, the board expressed concern that the merged entity would be highly leveraged, and questioned the ability of Express Scripts to manage a large-scale integration. Finally, the board suspected that the Express Scripts offer was purely defensive and meant to disrupt the CVS/Caremark merger, particularly given its conditional nature.[11] On January 7,

Nor may plaintiffs rely upon some naturally-occurring rate or combination of deal protection measures, the existence of which will invoke the judicial blue pencil. Rather, plaintiffs must specifically demonstrate how a given set of deal protections operate in an unreasonable, preclusive, or coercive manner, under the standards of this Court's *Unocal* jurisprudence, to inequitably harm shareholders.

Nevertheless, because I conclude that plaintiffs are not subject to any irreparable harm so long as shareholders are given the opportunity to exercise a fully-informed vote, I need not address the specific deal protections at this stage in litigation.

11. On the other hand, nothing in the record suggests that Express Scripts intends to offer directors and management the pecuniary benefits ensured by the CVS/Caremark merger. Although a different merger might constitute a "change of control" for purposes of accelerated payments, an alternate bidder might insist upon renegotiation of those contracts as part of a merger proposal. Nor is it certain that Express Scripts would honor options later found to be backdated or offer Caremark directors an expanded indemnity. Of course,

2007, the Caremark board issued a press release stating that it had determined, after consultation with its advisors, that the Express Scripts offer did not constitute a "Superior Proposal."

### 4. CVS bumps its offer

On January 13, 2007, Ryan called Crawford to propose a modification to the CVS/Caremark merger agreement. Caremark's shareholders, according to this plan, would receive a special $2.00 dividend, to be declared by Caremark before the effective date of the merger and paid to Caremark's shareholders either at the time of, or immediately after, the merger. Although declared *before* the date of the Caremark shareholder meeting called to approve the merger, this dividend would be payable only *if* the merger were to be approved. Further, Ryan proposed that the combined CVS/Caremark entity would engage in an accelerated share repurchase transaction whereby it would retire approximately 150 million shares of common stock after the merger. On January 17, 2007, after some discussion with its advisors, the Caremark board adopted a resolution approving this revised CVS proposal.

### 5. Express Scripts begins its exchange offer

On January 16, 2007, Express Scripts commenced an exchange offer for all outstanding shares of Caremark common stock on the same economic terms as the unsolicited proposal submitted to Caremark on December 18, 2006. On January 24, 2007, the Caremark board discussed the Express Scripts exchange offer, and after consulting with its financials advisors and outside legal counsel, unanimously reaffirmed its determination that the Express Scripts proposal did not constitute, and was not reasonably likely to lead to, a "Superior Proposal" as defined in the CVS/Caremark merger agreement. Two days later, on January 26, 2007, Caremark issued a recommendation to its shareholders to reject Express Scripts' exchange offer. In addition to listing the factors considered by the board in rejecting Express Scripts' original proposal, the recommendation also described the offer as highly conditional and illusory, containing questionable financing commitments, uncertain in its tax implications, and possibly without coverage of the $675 million termination fee contained in the existing CVS/Caremark merger agreement.

Caremark and Express Scripts are now in the throes of an all-out proxy contest for the votes of Caremark stockholders. Plaintiffs and defendants have engaged in a war of words, fought in newspapers, on television news programs, in regulatory disclosures, and before this Court. Each seeks to persuade shareholders that one deal represents the best value, or that another leaves money on the table. On February 12, 2007, Caremark filed an 8–K with the SEC providing shareholders with additional information in disclosure statements. The next day, CVS agreed to "allow" an increase in the conditional "special dividend" to $6 per share. Out of concern that shareholders would have insufficient time to consider the February 12 disclosures, this Court enjoined the Caremark shareholders' meeting, initially set for February 20, 2007, until at least March 9, 2007. As it turns out, that date was slightly overoptimistic.

---

it is possible that an eventual Express Scripts/Caremark merger *would* include each of these conditions, or that Caremark management would have insisted upon each benefit in the course of negotiations. Given that

Caremark never began the discussion, however, the Court has no record before it to suggest these benefits were likely to be available from any party other than CVS.

## II. CONTENTIONS

Although the shareholder plaintiffs and Express Scripts differ in the precise relief they request, both ask this Court to issue a preliminary injunction preventing a Caremark shareholders' meeting to approve the CVS/Caremark merger. All plaintiffs contend that the individual defendants breached their fiduciary duties by: (a) agreeing to a CVS/Caremark merger that contains deal protection measures inconsistent with their fiduciary duties; (b) failing to investigate and consider other merger opportunities, such as the Express Scripts offer; (c) failing to disclose to shareholders information material to their decision to accept either offer; and (d) in the case of CVS, aiding and abetting Caremark defendants in each of these violations of fiduciary duty. Plaintiffs assert that the individual defendants breached their fiduciary duties at least in part due to their personal interests in consummating the CVS/Caremark transaction.[12]

Defendants insist that they have behaved consistently with their fiduciary duties at all times, and that the deal protections are nothing more than market-standard contract terms negotiated as part of a merger of equals between two strategically-motivated companies. Although they admit that Crawford and Spaulding may be interested, they emphasize that the Caremark board is comprised of a majority of independent directors. Defendants protest that shareholders, far from being denied information, have been inundated with it. In addition to denying that any breach of fiduciary duty occurred, CVS maintains that it engaged in no conduct sufficient to constitute aiding and abetting. Further, CVS insists that Express Scripts lacks standing to pursue its complaint.

## III. STANDING OF EXPRESS SCRIPTS AND KEW CORP.

As an initial matter, I address defendant CVS's challenge to Express Scripts' standing to pursue many of the claims contained in its complaint. Although Express Scripts' subsidiary, KEW, currently owns at least 591,180 Caremark shares, all were purchased on or after December 13, 2006—more than one month after defendants announced the merger agreement. Thus, CVS argues that KEW purchased its shares with full knowledge of the terms of the merger and, as a result, lacks standing to challenge them. To the extent Express Scripts may not allege claims against Caremark for breaches of fiduciary duty, it may not allege claims against CVS for aiding and abetting those breaches.

■ Delaware law discourages the "evil" of purchasing stock for the purpose of maintaining claims that attack past transactions.[13] This well-settled law precludes plaintiffs from challenging a board decision that occurred before plaintiffs' stock ownership arose.[14] Thus, all derivative complaints must aver "that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law."[15]

---

**12.** Plaintiffs Skadden and Express Scripts also seek declaratory judgments from this Court regarding a potential conflict of interest arising from a prior relationship between Skadden and CVS. These counts of the Express Scripts complaint are not implicated by its motion for a preliminary injunction, however, and are not considered here.

**13.** *Omnicare, Inc. v. NCS Healthcare,* 809 A.2d 1163, 1170 (Del.Ch.2002), *rev'd on other grounds,* 818 A.2d 914 (Del.2003) (citations omitted).

**14.** *Id.; see also Ryan v. Gifford,* 2007 WL 416162, at *12 (Del.Ch. Feb. 6, 2007).

**15.** 8 *Del. C.* § 327.

██ Express Scripts lacks standing to challenge any transaction occurring before December 13, 2006, including the Caremark board's decision to enter into the merger agreement itself and CVS' alleged aiding and abetting such breach. This determination is of little practical consequence, however, as Express Scripts retains standing to challenge directorial actions occurring after December 13, 2006. This would include the board's treatment of its unsolicited offer, alleged disclosure violations, the Caremark board's interpretation of its contractual and fiduciary duties inasmuch as these interpretations resulted in the later rejection of Express Script's tender offer,

or any other board decision made after KEW purchased its shares. Express Scripts may also assert aiding and abetting claims against CVS for actions occurring after December 13, 2006.

## IV. PRELIMINARY INJUNCTION STANDARD

 A preliminary injunction is extraordinary relief that may be granted only if plaintiffs demonstrate: (1) a reasonable probability of ultimate success on the merits at trial; (2) that the failure to issue a preliminary injunction will result in immediate and irreparable injury before the final hearing; and (3) that the balance of hardships weighs in the movant's favor.[16] The moving party bears a considerable burden in establishing each of these necessary elements.[17] Plaintiffs may not merely show that a dispute exists and that plaintiffs *might* be injured; rather, plaintiffs must establish clearly each element because injunctive relief "will never be

granted unless earned." [18] In this case, although plaintiffs have established a reasonable probability of success on the merits of their disclosure claims, they are only partially successful on the other two prongs of the preliminary injunction analysis.

My conclusion that shareholders face neither irreparable harm nor extraordinary inequity in the absence of the desired injunction rests critically upon the availability of another remedy: appraisal rights. This decision is not without some irony: it is plaintiffs, not Caremark's directors, who have convincingly asserted an entitlement to appraisal. The availability of appraisal rights will require Caremark and CVS to delay any meeting at least long enough to provide their shareholders with adequate information regarding their rights, as required by 8 *Del. C.* § 262(d)(1). Yet the ability of shareholders to vote in a fully-informed fashion, and the availability of appraisal rights to any shareholders that may be dissatisfied with the merger consideration, shape the limits of appropriate judicial intervention. Ultimately, the equities tip in favor of this Court staying its hand and allowing fully-informed, disinterested shareholders to be heard on the merits of this transaction, especially given the tempering power of the appraisal remedy.

## V. DISCLOSURE ISSUES

 Directors of Delaware corporations, as part of their fiduciary duties of care and loyalty, are bound by a duty of disclosure. Directors must "fully and fairly [disclose] all material information within

---

**16.** *Unitrin, Inc. v. Am. Gen. Corp.,* 651 A.2d 1361, 1371 (Del.1995); *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1278–79 (Del.1989).

**17.** *Thompson v. Enstar Corp.,* 509 A.2d 578, 580 (Del.Ch.1984) ("The heavy burden of es-

tablishing these prerequisites rests on the plaintiffs.").

**18.** *Lenahan v. Nat'l Computer Analysts Corp.,* 310 A.2d 661, 664 (Del.Ch.1973).

the board's control when it seeks shareholder action." [19] Information is material when "there is a substantial likelihood that a reasonable shareholder would consider [the omitted information] important in deciding how to vote." [20] Plaintiffs must show "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." [21] That is, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." [22]

CVS and Caremark triggered their duty of disclosure when they issued a joint proxy statement soliciting shareholder approval for the merger. Amid allegations of false and misleading statements and omissions of material fact, Caremark recently issued supplemental disclosures in an attempt to moot many of plaintiffs' original disclosure claims. As a result, only eight disclosure claims remain to be considered.

### A. Failure to Identify the True Purpose of the Supplement

 Plaintiff Express Scripts contends that Caremark misleads shareholders by asserting that the supplement issued February 12, 2007, simply updates the original proxy statement. According to plaintiffs, because none of the information in the supplement was new, the true purpose of the disclosures was to cure material misstatements and omissions, not to provide shareholders with updated information.

This argument amounts to nothing more than semantics. The use of the word "update" does not carry the weight suggested by Express Scripts, and it taxes the imagination to dream of the shareholder that could be misled in this fashion. For example, the supplement makes certain disclosures as to the payment arrangements of Caremark's financial advisors, agreements signed months before the original proxy was produced. The alleged misstatement simply is not material. The Court has more faith in Delaware shareholders than to think them so credulous as to be misled by the characterization of these disclosures as an "update."

### B. Failure to Disclose Material Relationships Between and Among the Parties and Their Advisors

 Plaintiff Express Scripts, in its opening brief, challenges defendants' failure to disclose that Ryan sits as a board member of Bank of America Corporation, parent to Caremark advisor Banc of America Securities. Defendants challenged the materiality of that relationship, but disclosed it nonetheless in the February 12, 2007 supplement. Now, Express Scripts argues that defendants failed to declare that no material relationships exist between Caremark and its advisors and CVS and its advisors. Plaintiff, however, fails to provide any hint that any other relationships exist.

To the extent that defendants disclosed the existence of one such relationship, shareholders may infer that no other material relationships exist. In the context of disclosure claims, plaintiffs bear the burden of demonstrating some material *fact*

---

**19.** *Stroud v. Grace,* 606 A.2d 75, 84 (Del. 1992).

**20.** *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1985) (adopting *TSC Indus. v. Northway Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48

L.Ed.2d 757 (1976)); *see also Zirn v. VLI Corp.,* 621 A.2d 773, 778–79 (1993).

**21.** *Rosenblatt,* 493 A.2d at 944.

**22.** *Id.*

that must be disclosed. Defendants are not required to make this type of negative disclosure. Further, such a disclosure will not significantly alter the total mix of information available to stockholders and is, thus, immaterial.

### C. Failure to Disclose Crawford's Expected Tenure

LAMPERS contends that defendants' supplemental disclosure as to the nonexistence of an agreement regarding Crawford's tenure remains materially false and misleading. Plaintiffs rely on one director's meeting notes that suggest that Crawford's tenure as Chairman would soon end, Crawford's comment at another board meeting that he would be Chairman, "but not for long," and an investment banker's notes suggesting that the merger agreement initially limited Crawford's tenure to one year.

Plaintiffs provide no documentation confirming the existence of any agreement regarding Crawford's tenure. All Caremark directors, as well as Spaulding and Ryan, gave sworn deposition testimony rejecting the existence of such an agreement. The language of the supplemental disclosure specifically states: "There is *no agreement,* arrangement, or understanding between the parties *mandating a specified length* for Mr. Crawford's tenure as chairman of the combined company." [23] Based on this language Crawford is free to terminate his employment at any time, be that two minutes or twenty years after consummation of the merger. Plaintiffs fail to convince me that any termination agreement exists between Crawford and the parties. To the extent Crawford's continued employment would alter a shareholder's vote, however, existing disclosures provide sufficient information regarding his anticipated tenure (or lack thereof).

### D. Failure to Disclose Negotiations of Conditional "Special Dividends"

 Plaintiffs argue that defendants omitted critical facts surrounding the negotiation of the conditional "special dividends." Specifically, they contend defendants fail to disclose that Spaulding, who had an $8 million personal interest in seeing the deal with CVS go forward, was the negotiator of the first $2 dividend increase and that Crawford, after a conversation with Ryan, expressly directed that Spaulding cease any efforts to negotiate a higher dividend price. Nor have defendants made any disclosures, say plaintiffs, regarding the negotiation of the recent $4 dividend increase. Plaintiffs contend that Caremark's board, having failed to vigorously negotiate the best dividend for the stockholders, also failed to disclose their failure.

Although this information heightens my suspicions regarding the integrity of the process underlying these merger negotiations, it does not significantly alter the total mix of information available to the shareholders and, thus, does not warrant additional disclosures. Caremark shareholders possess sufficient information regarding the negotiation process to make an informed decision regarding the adequacy of the CVS merger consideration. First, to the extent Caremark shareholders distrust a deal negotiated by interested management, the board disclosed in the supplement that management, most of whom stand to receive large change of control fees, negotiated the special dividend.[24] Little more may be gained by

**23.** Answering Br. of CVS in Opp'n to Pls.' Mot. for Prelim. Inj. Ex. 19 at 2 [hereinafter Supp. Disclosure] (emphasis added).

**24.** *Id.* at 3, 5.

disclosing that Spaulding, specifically, served as the negotiator.

Second, defendants have already disclosed the somewhat troubling aspects of the negotiation process (or lack thereof). The supplement informs shareholders that a member of management contacted CVS to discuss possible additional consideration in response to the Express Scripts bid. On the next day, Crawford expressed to the board his belief that CVS would increase the consideration of CVS's offer. Ten days later, "CVS [ ] *proposed* that (1) Caremark declare a special cash dividend in the amount of $2.00 per share of Caremark common stock, payment of which would be conditioned on the completion of the merger." [25] The board then "*considered and accepted* the proposal as an enhancement of the proposed merger which the Caremark board of directors *has already determined to be fair*, from a financial point of view, to the Caremark stockholder." [26] Based on these disclosures, a shareholder may readily infer the degree of vigor and energy with which the Caremark board negotiated for the conditional dividends. The current disclosures already suggest a certain indifference on behalf of the Caremark board and supine acceptance of any additional consideration that might descend like manna from heaven from CVS. Defendants are under no duty to engage in further self-flagellation.[27] In short, shareholders possess sufficient information regarding the negotiation process to make an informed decision.[28]

### E. Failure to Disclose the Relevance to CVS of the Backdating Investigation

Plaintiff Express Scripts argues that defendants' failure to disclose the backdating investigation leaves stockholders to believe that the backdating investigation is immaterial to CVS. Ryan professed belief that the backdating investigation was material to CVS's decision to enter into the merger. If CVS would not have entered into the agreement without assurances that the backdating claims lacked merit, argue plaintiffs, that information must be equally material to the shareholders.

The proxy already provides a wealth of information about numerous backdating lawsuits.[29] These repeated references to civil litigation provide enough notice to shareholders regarding the existence of backdating claims.[30]

### F. Failure to Disclose the Probable Impact of the Merger on the Pending Backdating Litigation

 Plaintiff LAMPERS contends that defendants' disclosures regarding the backdating litigation remain materially

---

25. *Id.* at 5 (emphasis added).

26. *Id.* (emphasis added).

27. *Stroud,* 606 A.2d at 84 n. 1.

28. Plaintiffs also argue that defendants failed to disclose negotiations surrounding the February 13, 2007 dividend increase. Based on defendants' failure to update their disclosure or include anything to the contrary in their supplement filed only one day earlier, shareholders may infer that the same type of "proposal" and "consideration of the proposal" occurred. CVS offered $4 more. Caremark, having already determined that the deal was fair from a financial point of view, accepted it. Without being overly cynical, I doubt shareholders will be misled as to whom to thank for the special dividend.

29. Am. Proxy at 97–98.

30. Moreover, a shareholder may reasonably infer from CVS's willingness to proceed with the merger that any concerns the CVS board may have had as to the long-term effects of backdating allegations on corporate profits have been addressed. That these trepidations were quelled by provision of an internal report from King & Spalding does not materially alter the total mix of information available to shareholders.

false and misleading in two ways. First, they fail to disclose that backdated options, which could be voided on the ground that they were issued in violation of Caremark's stock option plan, will nonetheless be honored under the merger agreement with CVS. Second, the contractual indemnification set forth in the merger agreement might entitle management to greater indemnification than Delaware law would allow Caremark to provide.

The proxy explains unequivocally that "each Caremark option (other than options issued under the legacy AdvancePCS stock option plans) will vest and become fully exercisable at the effective time of the merger." [31] Nowhere does the agreement exclude options granted in violation of the stock option plans. Shareholders possess sufficient information to surmise that alleged backdated options will be honored by CVS.

Current disclosures also provide shareholders with sufficient notice regarding CVS's indemnification of Caremark directors and officers for alleged backdating. The proxy specifically states that Caremark's directors will be indemnified not only "to the same extent such individuals are indemnified pursuant to Caremark's certificate of incorporation and bylaws" but also "*to the fullest extent permitted by law* .... " [32] This conjunctive language suggests an intent to grant indemnity in excess of that already offered by Caremark.[33] Nothing excludes backdating allegations from this language. These disclosures sufficiently inform shareholders that

CVS will indemnify directors in claims regarding backdated options.

## G. *Failure to Correct Misleading Disclosure Regarding Express Anti–Trust Risks*

■ Plaintiffs charge Caremark with materially misrepresenting to its shareholders that the Express Scripts' proposal carries significant, if not insurmountable, antitrust risks. Plaintiffs' expert opines that an Express Scripts/Caremark merger faces no substantial antitrust obstacles and that the FTC would not be likely to treat the two deals (Express Scripts/Caremark v. CVS/Caremark) differently. Defendants' expert did little to refute these assertions. Thus, this false and misleading statement alone warrants an injunction, according to plaintiffs. I disagree.

First, I am not convinced that the Express Scripts/Caremark deal faces immaterial antitrust difficulties. One cannot ignore the fact that Express Scripts withdrew its HSR notification to the FTC just two days before the expiration of the waiting period, only to re-file it four days later, restarting the agency's thirty-day period to decide whether to issue a second request. Second, the FTC has already approved the CVS/Caremark merger, eliminating delays related to antitrust approval. Third, the FTC will provide the ultimate answer regarding any antitrust risks. A significant part of that answer will become clear on March 8, 2007, the expiration date of the FTC waiting period for Express Scripts re-filed re-

---

31. Am. Proxy at 108.

32. *Id.* at 94 (emphasis added).

33. Caremark's ability to indemnify its directors is subject to statutory limitations of 8 *Del. C.* § 145. CVS, however, offers contractual indemnification, debatably not subject to § 145 because CVS seeks to indemnify Care-

mark, not CVS, board members. Thus, CVS arguably expands the customary directorial indemnification through its addition of the phrase "or to the fullest extent allowable" under Delaware law. Delaware courts, however, have not yet addressed whether § 145 would or would not apply in these circumstances.

quest. The market will have time to absorb the FTC's response to the Express Scripts/Caremark proposed merger. Finally, the market is saturated with information from Express Scripts (and as a result of this litigation) that directly challenges Caremark's assertions regarding antitrust risks. For all these reasons, additional disclosures are unnecessary and would not alter the total mix of information currently available.

## H. Failure to Properly Disclose the Structure of the Investment Banker's Compensation

■ Plaintiffs argue that disclosures regarding the amount and structure of the investment bankers' compensation are materially misleading. Specifically, plaintiffs seek additional disclosures stating, "[T]he fee arrangements for Caremark's bankers were structured, from the start, to provide that the bankers would be entitled to receive the lion's share of the bankers fees *only if Caremark entered into an initial agreement with CVS.*" [34]

By their terms, both the UBS and JP Morgan agreements require an opinion as to the advisability of the Caremark/CVS merger in the first instance. Such an opinion, regardless of the conclusion reached therein, triggers the payment of $1.5 million to each advisor.[35] Upon the consummation of the transaction (the Caremark/CVS merger) or an alternative transaction (*i.e.,* a merger with a third party) within a specified time period, an additional $17.5 million becomes payable to each company.

As a technical matter, the financial advisors must approve the CVS/Caremark merger to trigger their respective $17.5 million fees. Both the UBS and JP Morgan agreements state that "[i]n the event that, following public announcement of a Transaction with the Counterparty [CVS], the Company pursues a transaction structured in a manner contemplated by the definition of "Transaction" herein, with a third party other than the Counterparty (an "Alternative Transaction") . . . within nine months," the $17.5 million fee becomes payable.[36] Without an initial favorable recommendation, there would be no public announcement of a transaction with CVS and, therefore, (according to plaintiffs) no trigger of the $17.5 million transaction fees.

Defendants, in the February 12, 2007 supplement, disclosed that the consummation of a transaction between CVS and Caremark would result in payment of combined fees of $35 million. Defendants added, however, that "[i]f within a specified period, Caremark enters into an agreement . . . with a third party other than CVS . . . UBS and JP Morgan will each be entitled to the same transaction fees with respect to the alternative transaction as would have been received upon the completion of the merger with CVS." [37] By the time defendants issued this statement, the initial requirement for payment (approval and public announcement of the transaction) had already occurred. Thus, UBS and JP Morgan are each entitled to receive $17.5 million upon the occurrence of any "Transaction" with any party within nine months.

Although this disclosure is technically true, it is misleading by omission, because it fails to disclose the initial requirement the bankers had to meet in order to re-

---

**34.** Reply Br. of Express Scripts in Supp. of Pls.' Mot. for Prelim. Inj. at 44.

**35.** Leaman Dep. Ex. 26 at 2; Stute Dep. Ex. 2 at 2.

**36.** Leaman Dep. Ex. 26 at 1; Stute Dep. Ex. 2 at 2–3.

**37.** Supp. Disclosure at 4.

ceive their fees. This Court has recognized that the contingent nature of an investment banker's fee can be material and have actual significance to a shareholder relying on the banker's stated opinion.[38] Where a public announcement of a contemplated transaction is a prerequisite for receipt of fees, those fees are naturally contingent upon initial approval of the transaction. It follows then that where a significant portion of bankers' fees rests upon initial approval of a particular transaction, that condition must be specifically disclosed to the shareholder. Knowledge of such financial incentives on the part of the bankers is material to shareholder deliberations.

## VI. APPRAISAL RIGHTS

■ Plaintiffs contend the $6 special cash dividend triggers appraisal rights under 8 *Del. C.* § 262. Defendants respond that the special dividend has been approved and will be payable by Caremark and, thus, has independent legal significance preventing it from being recognized as merger consideration. Thus, according to defendants, dissenting Caremark shareholders will have no appraisal rights after the CVS/Caremark merger.

Section 262 of the DGCL grants appraisal rights to stockholders who are required, by the terms of the merger, to accept any consideration other than shares of stock in the surviving company, shares of stock listed on a national securities exchange, or cash received as payment for fractional shares.[39] The $6 "special dividend," although issued by the Caremark board, is fundamentally cash consideration

paid to Caremark shareholders on behalf of CVS.

Defendants are unsuccessful in their efforts to cloak this cash payment as a "special dividend." CVS and Caremark filed a joint proxy in which they informed shareholders of the merger terms and recommended merger approval. This proxy statement lists details of the special cash dividend:

> CVS separately granted a waiver to Caremark from the restrictions set forth in Section 6.01(b) of the merger agreement to permit Caremark to pay a one-time, special cash dividend to holders of record of Caremark common stock (on a record date to be set by the Caremark board of directors) in the amount of $2.00 per share of Caremark common stock held by each such holder on such record date, which dividend shall, under the terms of the CVS waiver, be declared prior to the Caremark special meeting, but *shall only become payable upon or after the effective time of the merger, and such payment shall be conditioned upon occurrence of the effective time of the merger.*[40]

Thus, defendants specifically condition payment of the $6 cash "special dividend" on shareholder approval of the merger agreement. Additionally, the payment becomes due upon or even *after* the effective time of the merger. These facts belie the claim that the special dividend has legal significance independent of the merger. CVS, by terms of the CVS/Caremark merger agreement, controls the value of the dividend.[41] Defendants even warn in their public disclosures that the special cash dividend might be treated as merger

---

**38.** *In re Chicago & North W. Transp. Co. S'holder Litig.,* 1995 WL 389627, at *4 (Del. Ch. June 26, 1995).

**39.** 8 *Del. C.* § 262(b).

**40.** Am. Proxy at 40 (emphasis added).

**41.** Supp. Disclosure at 5 (According to Caremark's Form 8–K, filed on February 12, 2007, CVS, not Caremark, proposed that Caremark declare a special dividend and determined the amount.)

consideration for tax purposes.[42] In this case, the label "special dividend" is simply cash consideration dressed up in a none-too-convincing disguise. When merger consideration includes partial cash and stock payments, shareholders are entitled to appraisal rights. So long as payment of the special dividend remains conditioned upon shareholder approval of the merger, Caremark shareholders should not be denied their appraisal rights simply because their directors are willing to collude with a favored bidder to "launder" a cash payment. As Caremark failed to inform shareholders of their appraisal rights, the meeting must be enjoined for at least the statutorily required notice period of twenty days.[43]

## VII. IRREPARABLE HARM AND BALANCE OF THE EQUITIES

 Shareholders would suffer irreparable harm only were they to be forced to vote without knowledge of the material facts relating to the structure of bankers fees and, most importantly, their entitlement to appraisal rights under the transaction as it is presently constructed. As such, no shareholder vote on the merger may take place for at least twenty days after defendants properly disclose that Caremark shareholders possess appraisal rights in connection with the "special cash dividend." Caremark must also disclose the structure of bankers fees before any vote may take place.

The availability of appraisal rights, however, weakens plaintiffs' argument for a broader preliminary injunction delaying the meeting altogether. Although serious questions remain regarding the process surrounding the merger negotiations, this Court places great trust in the decisions of informed, disinterested shareholders. So long as appraisal rights remain available, shareholders fully apprised of all relevant facts may protect themselves. They need no further intervention from this Court.

## VIII. CONCLUSION

Based on the foregoing reasons, this Court enjoins any vote of Caremark shareholders with respect to the CVS/Caremark merger for at least twenty days after defendants properly disclose to shareholders (a) their right to seek appraisal and (b) the structure of fees paid to Caremark's bankers. At this stage, however, no broader injunction is necessary. The balance of the equities weighs in favor of permitting informed shareholders to speak directly to their fiduciaries without further intervention by this Court.

No party should infer from the fact that I am denying plaintiffs an injunction that existence of appraisal rights and the disclosure of all material information to informed, disinterested shareholders somehow excuses violations of fiduciary duties under Delaware law. This Opinion addresses only a preliminary injunction, an extraordinary remedy granted to parties in order to preserve rights that would otherwise be extinguished over the course of litigation. Even were plaintiffs entirely certain, let alone reasonably likely, to prevail on the merits of their complaints, defendants may not be enjoined before they have the opportunity to present a defense at trial, so long as a later judgment will retain the power to make plaintiffs whole.

IT IS SO ORDERED.

---

**42.** Am. Proxy at 100.

**43.** 8 *Del. C.* § 262(d)(1).