# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE COMVERGE, INC.  )  CONSOLIDATED
SHAREHOLDERS LITIGATION  )  C.A. No. 7368-VCP

## MEMORANDUM OPINION

Date Submitted: March 19, 2014
Date Decided: November 25, 2014

Carmella P. Keener, Esq., P. Bradford deLeeuw, Esq., ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware; Seth D. Rigrodsky, Esq., Brian D. Long, Esq., Gina M. Serra, Esq., RIGRODSKY & LONG, P.A., Wilmington, Delaware; James R. Banko, Esq., FARUQI & FARUQI, Wilmington, Delaware; James S. Notis, Esq., Kira German, Esq., GARDY & NOTIS, LLP, Englewood Cliffs, New Jersey; Juan E. Monteverde, Esq., FARUQI & FARUQI, LLP, New York, New York; Shannon L. Hopkins, Esq., Sebastiano Tornatore, Esq., LEVI & KORSINSKY LLP, New York, New York; *Attorneys for Plaintiffs*.

A. Thompson Bayliss, Esq., ABRAMS & BAYLISS LLP, Wilmington, Delaware; Timothy A. Duffy, P.C., KIRKLAND & ELLIS LLP, Chicago, Illinois; *Attorneys for Defendants H.I.G. Capital, L.L.C., Peak Holding Corp. and Peak Merger Corp.*

Thomas A. Beck, Esq., Gregory P. Williams, Esq., Rudolf Koch, Esq., Kevin M. Gallagher, Esq., Christopher H. Lyons, Esq., RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; John L. Latham, Esq., Robert L. Long, Esq., Susan E. Hurd, Esq., ALSTON & BIRD LLP, Atlanta, Georgia; *Attorneys for Defendants Comverge, Inc., Alec G. Dreyer, Joseph M. O'Donnell, John McCarter, R. Blake Young, Nora Mead Brownell, A. Laurence Jones, John Rego, Rudolf J. Hoefling, David R. Kuzma and James J. Moore.*

**PARSONS, Vice Chancellor.**

This is a stockholder challenge to the now-completed merger between Comverge, Inc. and a financial acquirer. The plaintiffs, who owned Comverge common stock before the merger's closing, charge the members of the Comverge board of directors with breaching their fiduciary duties in connection with the merger. The plaintiffs contend that the defendants conducted a flawed sales process and unreasonably decided not to sue the acquirer for alleged breaches of a non-disclosure agreement, both of which resulted in an inadequate merger price. The plaintiffs further allege that the directors agreed to unreasonable deal protection measures that precluded the possibility of a topping bid, including termination fees and related payments that, by the plaintiffs' accounting, amounted to 13% of the equity value of the transaction. The plaintiffs also accuse the acquirer of aiding and abetting those fiduciary breaches.

The director defendants and the acquirer have moved to dismiss the complaint under Rule 12(b)(6) for failure to state a claim. In this Memorandum Opinion, I conclude that it is not reasonably conceivable that the board of directors, the disinterestedness and independence of which is not in question, acted in bad faith with respect to the sale process. Because the company has an exculpatory charter provision, I therefore dismiss this aspect of the plaintiffs' claims. I deny the directors' motion to dismiss, however, as it relates to the deal protection measures. In that regard, I find it reasonably conceivable based on the record currently before me that the plaintiffs could show that the termination fee structure, including a convertible bridge loan provided by the acquirer, was unreasonable and had an impermissibly preclusive effect on potential alternative bidders.

1

Regarding the aiding and abetting claims against the acquiring company, I grant the motion to dismiss because, even assuming there was a predicate breach of fiduciary duty by the directors, the plaintiffs have not alleged non-conclusory facts that conceivably would support a claim that the acquirer knowingly participated in those breaches.

Lastly, I deny as moot the plaintiffs' motion to strike one of the documents proffered by the defendants. I did not consider that document in reaching any of the conclusions contained in this Memorandum Opinion.

## I.     BACKGROUND[1]

### A.     The Parties

Plaintiffs, Gary K. Schultz and Saravanan Somlinga, purportedly were stockholders of Comverge, Inc. ("Comverge" or the "Company") at all relevant times. Defendant Comverge was a Delaware corporation with its principal place of business in Norcross, Georgia. Each of Comverge's ten directors—R. Blake Young, Nora Mead Brownell, Alec G. Dreyer, Rudolf J. Hoefling, A. Laurence Jones, David R. Kuzma, John T. McCarter, James J. Moore, Joseph M. O'Donnell, and John S. Rego (collectively, the "Board" or the "Director Defendants," and together with the Company, the "Comverge Defendants")—also are named Defendants. Of the ten directors, only Young, the President and CEO, was employed by the Company. Defendant H.I.G. Capital, L.L.C.

---

[1]     Unless otherwise noted, the facts recited herein are drawn from the well-pled allegations of the Verified Consolidated Second Amended Class Action Complaint (Docket Item 115) (the "Complaint"), together with the documents integral thereto, and are presumed true for purposes of this Memorandum Opinion.

2

("HIG"), a Delaware limited liability company, is a private equity and venture capital firm with approximately $8.5 billion under management. Defendants Peak Holding Corp. and Peak Merger Sub are HIG affiliates and Delaware corporations (together, "Peak," and collectively with HIG and the Board, "Defendants").

## B. Facts

### 1. Comverge needs liquidity

This case concerns HIG's acquisition of Comverge in early 2012. Before the acquisition, Comverge offered "intelligent energy management" or "IEM" solutions, through which commercial, industrial, and residential customers can match electricity use with the cost of purchasing electricity at a given time, thereby adjusting their energy usage to save costs. Utility companies also use IEM technology to monitor power consumption and adjust power distribution to prevent outages during peak times. Comverge traded on NASDAQ under the ticker "COMV" from April 2007 until the buyout was completed. The Company's April 2007 IPO price was $18 per share. On March 23, 2012, the last trading day before the deal was announced, Comverge stock closed at $1.88 per share. The Company had been accumulating annual net losses despite steadily increasing revenues of $98.8 million, $119.4 million, and $136.4 million for 2009, 2010, and 2011, respectively.

By late 2010, Comverge needed capital. At that time, it had two credit facilities secured by the Company's assets: (1) a loan from Silicon Valley Bank (the "SVB Loan"), entered into in 2008; and (2) a subordinated loan from Partners for Growth III, L.P. ("PFG"). In early 2010, the SVB Loan was amended and its revolving credit facility was

3

increased from $10 million to $30 million to fund general working capital and other corporate activities. In November 2010, Comverge and PFG entered into a second debt agreement (the "PFG Note"), which provided for $15 million in notes convertible into Comverge common stock at a conversion price of $5.46 per share. Among other things, the PFG Note gave PFG the right to block any acquisition proposal, and required the Company to meet certain minimum capitalization requirements set by PFG.

During the same time period, Comverge hired J.P. Morgan Securities LLC ("JP Morgan") as its financial advisor, and through the beginning of 2011, JP Morgan canvassed potential investors for their interest in acquiring a twenty percent equity stake in the Company. Of the twenty-five potential investors contacted, five strategic companies and five financial buyers executed confidentiality agreements, but none expressed an interest in the proffered minority equity position. One of the potential investors did submit, however, a non-binding indication of interest in acquiring the entire Company for $7 per share. That triggered a brief sales process between May and July 2011 in response. According to JP Morgan's analysis at that time, a reasonable price would have been closer to $9 per share. The Company then hired UBS Securities LLC ("UBS") to provide a fairness opinion, but UBS concluded that it could not give such an opinion as to the bidder's final offer based on Comverge's financial projections. Ultimately, the potential bidder and the other interested parties dropped out of the process.

Thereafter, the Company considered various alternatives for meeting its increasingly pressing capital needs, including a public offering of equity and the issuance

4

of new subordinated debt. Neither strategy panned out. By November 2011, management was warning that the Company might not be able to meet the revenue requirements to avoid default under the PFG Note. Nevertheless, in spite of these liquidity concerns, management remained upbeat about the Company's improving performance and strong growth prospects. Comverge's 2011 annual and fourth quarter results showed the "strongest operational and financial performance in the company's history,"[2] and Young described the Company as well-positioned for growth and continued success due to "recent new client wins, strong backlog, and improved cost structure."[3]

### 2. HIG and Comverge begin discussions

Against this backdrop, Joseph D. Zulli, a principal of HIG, contacted Brownell, then a Comverge director, about the potential of HIG investing in the Company. Brownell put Zulli in touch with management in early November 2011, and the two companies began discussions. Young and David Mathieson, Comverge's CFO, indicated that Comverge was not for sale at that time, but that the Company sought to raise debt-financed capital to head off an anticipated liquidity squeeze in 2012. On November 15, 2011, Comverge and HIG executed a non-disclosure agreement (the "NDA").[4] Among

---

[2]    Compl. ¶ 38

[3]    *Id.* ¶ 39.

[4]    Regarding the NDA, HIG acted through an affiliate named H.I.G. Middle Market, L.L.C. *See* Comverge Defs.' Opening Br. ("Comverge's Opening Br.") Ex. 4, Comverge, Inc., Schedule 14D-9 (Apr. 12, 2012) (the "April 14D-9"), at 6. The April 14D-9 may be considered at the motion to dismiss stage because it is integral

5

other things, the NDA contains a two-year "standstill" provision, in which HIG agreed that it would not "acquire, agree to acquire, propose, seek or offer to acquire, or facilitate the acquisition or ownership of, any securities or assets of COMVERGE, any warrant or option to purchase such securities or assets, any security convertible into any such securities, or any other right to acquire such securities."[5]

In the same section of the NDA, however, the parties agreed that: "Notwithstanding the foregoing, and as described in Section 14, nothing in this section shall preclude H.I.G. from acquiring securities of COMVERGE in the public markets as a public investor in COMVERGE, so long as such transactions do not violate the applicable United States securities laws."[6] Section 14 states that:

> COMVERGE acknowledges and understands that H.I.G. and its Representatives may or [sic] in the future evaluate, invest in or do business with competitors or potential competitors of COMVERGE. Neither the execution of this Agreement nor receipt of Confidential Information shall in any way restrict or preclude such activities. Moreover, notwithstanding any provision of this Agreement to the contrary, this Agreement shall not limit, restrict or impair H.I.G.'s ability or the ability of is Representatives to engage in transactions with respect to securities, bank debt, instruments and interests of COMVERGE or any other person or entity, so long as such

---

to the Complaint, and was attached as an exhibit to Plaintiffs' motion for a preliminary injunction. *See In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69-70 (Del. 1995).

[5] Pls.' Br. in Opp'n ("Pls.' Answering Br.") Ex. B (the "NDA") § 9.

[6] *Id.*

6

transactions do not violate applicable United States securities laws.[7]

After the NDA was executed, Comverge provided HIG with information regarding, among other things, its financial condition, debt structure, budgets, five-year forecasts, management presentations, and business plan. The Company claimed that at least some of this information was confidential or non-public.

On November 30, 2011, HIG indicated it would consider making a loan to Comverge, but was more interested in acquiring the whole company, although it did not specify a price. Shortly thereafter, the Board established a Transaction Committee consisting of Director Defendants Dryer, Jones, and Rego.[8] HIG was given access to an electronic data room containing financial, commercial, and legal information in early December. Around that time, Mathieson contacted HIG to ask if it would consider extending a bridge loan to the Company at the beginning of 2012. HIG submitted a non-binding proposal on December 21, 2011, in which it offered to buy Comverge for $1.75 cash per share and to make a $12 million bridge loan. HIG also requested the exclusive right to negotiate with Comverge for 30 days.

---

[7]  NDA § 14. The parties agreed that the NDA would be governed by and construed according to Georgia law. *Id.* § 17.

[8]  Several weeks later, on January 17, 2012, director McCarter was added to the Transaction Committee. I also note that on February 27, 2012, the Transaction Committee was reconstituted as the Strategy Committee. April 14D-9 at I-13. In the interest of simplicity, I refer to both the Transaction Committee and the later Strategy Committee as "the Committee."

The Committee, after meeting to consider the offer, declined to agree to the exclusivity period. The Committee and Comverge management, in conjunction with JP Morgan, continued to communicate with HIG and to explore strategic alternatives. On January 12, 2012, HIG increased its bid to $2.00 per share. The Committee met multiple times to consider this proposal, and the full Board discussed it at a meeting on January 17. HIG then increased its bid to $2.15, but eventually made the exclusivity period a condition of further negotiation. The Committee, which was meeting daily at this point, agreed to negotiate exclusively with HIG for a period commencing on January 28 and ending on February 15.

Just two days after the exclusivity period began, Comverge received a letter from "Company X," with whom it had had previous discussions, expressing an interest in acquiring Comverge at $2.00 per share. Three days later, Company X made a non-binding proposal in which it indicated an interest in the range of up to $4.00 to $6.00 per share. The exclusivity agreement, however, prevented Comverge from engaging with Company X at that time.

The Committee met on February 6, and the full Board on February 7, to consider the HIG offer of $2.15 per share. That offer included various deal protection measures and a 30-day "go-shop" period. After the Board signaled that this offer was inadequate, HIG bumped it up to $2.25 on February 14. The Board, in consultation with legal counsel and JP Morgan, again rejected that offer as inadequate and asked HIG to increase its price further. The Complaint alleges that the Committee had in mind a $3.00 per share minimum price based on the interest from Company X and relatively positive discussions

8

with Comverge's lenders.  But, HIG declined to raise its offer and let it expire by its terms on February 15, along with the exclusivity agreement.  The Board then instructed management and JP Morgan to accelerate their negotiations with Company X.

Comverge's management and Board were juggling other potential problems during this time frame: the Company had a serious need for capital, and a major stockholder, the Ardsley Group, was threatening to run a competing slate of directors. Throughout February 2012, the Company and its legal and financial advisors discussed restructuring Comverge's debt, and prepared forbearance agreements to avert amortization or acceleration of the SVB Loan and the PFG Note.  Both lenders indicated a willingness to forbear or restructure the terms of the indebtedness.  The Company reached a standstill agreement with the Ardsley Group on February 27.  Under the terms of that agreement, the Board was increased from eight to ten directors, one director resigned, and three Ardsley nominees—Kuzma, Moore, and Hoefling—were appointed.

### 3.    Comverge is outflanked

Undaunted by the Board's February 15 rejection of the $2.25 offer,  HIG, through Zulli, contacted PFG on February 16 about buying the PFG Note.  According to the Complaint, both PFG and HIG "acknowledged . . . that HIG's desire to buy a controlling interest in the PFG Note was in further [sic] of HIG's plan to acquire Comverge and—in Zulli's words—'to exert influence over the company.'"[9]  Back on February 2, 2012, while talks were ongoing between HIG and Comverge, Zulli had written Mathieson to

---

[9]      Compl. ¶ 70.

inquire about the status of the PFG Note and whether any events of default or covenant breaches existed. While negotiating with PFG about acquiring the PFG Note, Zulli asked similar questions of PFG's Andrew Kahn.

On February 24, HIG notified Comverge that an affiliate of HIG, Grace Bay Holdings II, LLC ("Grace Bay"), had purchased 51 percent of the PFG Note for $7.65 million, with an option to buy the rest for $8.86 million. Grace Bay exercised that option two weeks later. Thus, HIG (through Grace Bay) ultimately paid a premium of approximately 10 percent over the face value of $15 million to acquire the subordinated convertible PFG Note. On February 27, Grace Bay notified the Board that Comverge was in default under the PFG Note because it had failed to deliver certain compliance certifications. The Board met that day and considered whether to take legal action against HIG for violating the NDA, but decided against it. Until it met again on March 1, the Committee allegedly was unaware that the PFG Note contained "blocking rights" that would hinder a potential sale of the Company.

On March 2, 2012, Grace Bay again wrote the Company, asserting that in addition to the default based on the compliance certificate, Comverge had failed to meet the minimum revenue targets required by the PFG Note. The Board responded by disputing both points. On March 5, Zulli confirmed to Jones and another Board member that HIG remained interested in acquiring the Company. HIG reduced its offer, however, to $1.50 in cash per share, and reduced the reverse break-up fee (which would have been payable to Comverge by HIG) from $20 million to $3.5 million. HIG also kept its offer of bridge financing on the table. That offer involved notes convertible into Comverge common

10

stock at $1.40 per share. The full Board met to discuss HIG's offer, and they directed the Committee to ask HIG to increase its offer price, which it did, to $1.75 per share.

At the same time, several Board members reached out to a large Comverge stockholder to gauge its interest in an equity financing transaction. After executing a confidentiality agreement with that stockholder, the Company discussed its need for capital in light of the potential acceleration of the PFG Note, and the likelihood that the Company would be pushed into bankruptcy if liquidity were not obtained. The stockholder was amenable to helping the Company restructure its debt obligations. Nevertheless, no practicable solution materialized at that time because of the uncertainty regarding the SVB debt and the Grace Bay situation.

On March 12, 2012, UBS informed the Board that it would not provide a fairness opinion with respect to HIG's $1.75 offer under the circumstances. JP Morgan similarly declined. The Committee, after meeting to consider its options, hired Houlihan Lokey Capital, Inc. ("Houlihan") to review the transaction and render an opinion as to its fairness. Through the requisite filings with the SEC, the Company announced its 2011 annual and fourth quarter financial results on March 15, 2012. Although revenue was up and annual net loss was down compared to 2010, the Company's auditor opined that there was substantial doubt as to Comverge's ability to continue as a going concern. Indeed, based on its cash flow as compared to its debt obligations as of the March 15 filing, the Company may have been in default.

Negotiations between advisors to HIG and Comverge continued, and the parties exchanged draft merger documents. On March 21, 2012, the Company and the Board

11

received a letter from Raging Capital Management, LLC ("Raging Capital"), an 11.9 percent stockholder of the Company. In it, Raging Capital argued that, to the extent the Company was going to raise equity capital, the existing stockholders should be able to participate on a pro rata basis, and it offered to "backstop" an equity offering or provide a bridge loan to tide Comverge over until such an offering could be completed. The Board discussed Raging Capital's letter at its March 24 meeting, but concluded that, in light of the Company's severe liquidity concerns and Grace Bay's assertion of default on the PFG Note, the Company could not pursue a deal like the one Raging Capital proposed.[10]

Also on March 24, the Committee requested HIG's "best and final offer." HIG refused to go higher than $1.75 per share. Comverge's stock then was trading at $1.88 per share. HIG also told the Committee that if the merger agreement was not signed within two days, Grace Bay would accelerate the debt under the PFG Note and declare the entire principal and outstanding interest due and payable. Later that day, Grace Bay sent Comverge a notice of acceleration and foreclosure to the same effect. The Committee met and Houlihan provided its opinion that HIG's offer was fair to the Comverge stockholders from a financial point of view. The full Board then met to receive presentations from legal counsel, discuss the proposed transaction, and review the draft agreements. The Board voted unanimously to approve the agreement and plan of merger with HIG (the "Merger Agreement"). Young, as the only member of management sitting on the Board, abstained from voting because of HIG's indication that

---

[10] April 14D-9 at 14.

12

it would retain the management team after closing. Grace Bay revoked the notice of acceleration and foreclosure on March 25.

### 4.        HIG completes the acquisition

The next day, Comverge and HIG executed the Merger Agreement and several related documents. The deal was structured as a two-step acquisition in which HIG would acquire shares in a public tender offer and then execute a back-end merger to complete the takeover. Toward this end, the Merger Agreement granted HIG a "top-up option" that might enable the second step to be completed in a short-form merger. At the $1.75 per share offer price, the acquisition had an equity value of approximately $48 million. In addition, HIG and Comverge entered into a $12 million bridge loan agreement, which HIG funded immediately. The notes issued under the bridge loan agreement bore an interest rate of 15 percent per annum and were convertible at the election of HIG into 8,571,428 shares of Comverge common stock at a conversion price of $1.40 per share (the "Convertible Notes").

The Merger Agreement provided for a 30-day "go-shop" period, which could be extended by 10 days if Comverge received and was negotiating a potentially superior proposal. During the go-shop period, a termination fee of $1.206 million was in effect, and Comverge also agreed to reimburse HIG for up to $1.5 million in expenses. After the go-shop period expired, the termination fee increased to $1.93 million. In addition, Comverge and Grace Bay entered into a forbearance agreement (the "Forbearance Agreement") pursuant to which Grace Bay agreed for a limited time not to exercise its

rights under the PFG Note, including the blocking rights by which it otherwise might impede an alternative transaction.

On March 28, two days after the Merger was announced, Raging Capital filed a Schedule 13D with the SEC, in which it addressed the Comverge Board and scathingly criticized the proposed Merger. The Raging Capital letter stated in part:

> To put it simply, we are extremely disappointed with the price, terms and structure of this proposed acquisition and the actions taken by the Board of Directors (the "Board") in furtherance thereof. The proposed acquisition values Comverge at less than $50 million which, in our view, is a grossly inadequate equity valuation for a company with a $500 million multi-year backlog, more than 500 utility and commercial clients, and a leading edge technology platform. By our calculations, the offer price also represents a significant discount to the valuation of the Company's primary publicly traded peer [EnerNOC, Inc.].
>
> Even more troubling, H.I.G. could potentially reap payments worth up to 14% or more of the deal value in the event the deal is terminated, including up to $1.9 million in break-up fees, up to $1.5 million in expense reimbursements, and up to $3 million or more of profits upon conversion of its new convertible note to common shares (we view this bridge loan as essentially a second break-up fee designed to have a chilling effect on the ability of a third-party to submit a competing bid). Further, Comverge has only a short period of time, just 40 days, to "go shop" for a superior deal, even as H.I.G. retains a right of first refusal to match any superior offer. In short, we believe this deal is a lemon and we seriously question whether the Board has met its fiduciary obligations to shareholders. . . .
>
> We believe it is more than likely that [either Raging Capital or other stockholders would have] stepped up to refinance the Company rather than see it sold for a song to an opportunistic offeror. One must wonder what "package" Comverge's management will receive from H.I.G. to remain with the Company.

14

> While we have not yet decided on next steps, we believe Comverge remains an undervalued asset. We believe the Board, in the exercise of its fiduciary duties, should immediately withdraw its recommendation for H.I.G.'s proposal. We remain open to participating in an alternative transaction if we do not see a materially higher price for our shares.[11]

During the go-shop period, from March 26 through April 25, 2012, JP Morgan contacted multiple potential buyers, several of whom executed confidentiality agreements and conducted due diligence. This process yielded indications of interest from two bidders, one indentifying a range of $2.50 to $2.90 per share, the other indicating $3.25 per share.[12] No firm proposal was made, however. Plaintiffs attribute that to concern among potential suitors about completing due diligence during the specified timeframe and repaying the Convertible Note. The first-step tender offer period from April 11 and to May 9 partially overlapped with the go-shop period, and by May 9 approximately 52.2 percent of Comverge's outstanding shares of common stock were tendered.[13] After HIG made another tender offer from May 10 to May 14, the total percentage of tendered

---

[11]    Compl. ¶ 113 (emphases removed).

[12]    *Id.* ¶ 115.

[13]    Comverge, Inc., Current Report (Form 8-K), at 3 (May 18, 2012). At this motion to dismiss stage, I take judicial notice of essentially uncontroverted, publicly available facts such as those contained in filings made with the SEC, like this Form 8-K. *See In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006).

15

shares reached 65.1 percent. HIG then exercised its top-up option, and the Merger became effective on May 15, 2012.[14]

## C. Procedural History

Plaintiff Schultz filed this action on March 29, 2012, and within days Plaintiff Somlinga and three other plaintiffs each filed their own complaints. On April 6, 2012, I consolidated those actions and appointed lead counsel. Because two actions relating to the Merger also were pending in the courts of Gwinnett County, Georgia, Defendants filed a motion to proceed in one jurisdiction. Plaintiffs did not oppose that motion, and it was decided that the action would proceed here. I then granted a motion by Plaintiffs to expedite on April 27, and Plaintiffs promptly moved for a preliminary injunction to prevent the closing of the HIG tender offer. I heard argument on that motion on May 7 and by oral ruling the next day, denied it. The parties pursued discovery into 2013, which included a partially successful motion by Plaintiffs to compel certain documents from Defendants.

Plaintiffs moved to amend their complaint on June 28, 2013, and that amended pleading became the operative Complaint. The Comverge Defendants and the HIG Defendants separately moved to dismiss the Complaint pursuant to Court of Chancery Rule 12(b)(6). Plaintiffs also moved on February 24, 2014 to strike a certain document they assert was submitted improperly by the HIG Defendants in support of their motion

---

[14]    Compl. ¶ 115.

16

to dismiss.[15] I heard arguments on all of these motions on March 19, 2014. This Memorandum Opinion contains my rulings on those motions.

### D. Parties' Contentions

Count I of the Complaint alleges that the Director Defendants breached their fiduciary duties to the stockholders of Comverge by failing to take reasonable steps to maximize the value of the Company in the Merger with HIG. The Comverge Defendants seek to dismiss this Count on the ground that any duty of care claim is exculpated by a provision in Comverge's charter pursuant to 8 *Del. C.* § 102(b)(7), and that the facts as alleged do not give rise to a reasonably conceivable claim for breach of the duty of loyalty. Plaintiffs counter this argument by asserting that the Director Defendants' conduct amounts to bad faith and therefore is not protected by a Section 102(b)(7) exculpation provision.

Count II charges the HIG Defendants with aiding and abetting the fiduciary breaches that allegedly were committed by the Director Defendants. Plaintiffs allege that those breaches would not and could not have occurred but for HIG's conduct, and that HIG knowingly participated in the Director Defendants' breaches. The HIG Defendants seek dismissal of this claim for two reasons. First, the Complaint fails to state a claim for breach of fiduciary duty on the part of the Comverge Defendants and, without such an

---

[15] Specifically, the Motion to Strike pertains to Exhibit 2 to the Transmittal Affidavit of A. Thompson Bayliss ("Bayliss Aff."), which purportedly is an initial draft of the NDA between Comverge and HIG. Plaintiffs contend that this document is not publicly available and was not referenced in the Complaint, and, therefore, cannot be included in the factual record on Defendants' motions to dismiss.

underlying breach, there cannot be any liability for aiding and abetting. Second, they argue that the allegations in the Complaint do not support a reasonable inference that the HIG Defendants "knowingly participated" in the Comverge Defendants' fiduciary breaches, if any actually occurred. Plaintiffs respond that they have alleged, at a minimum, duty of care violations, and while Comverge's 102(b)(7) provision may exculpate directors from monetary liability for such breaches, it does not preclude a claim of aiding and abetting against HIG. They argue further that the facts alleged are more than sufficient to make it reasonably conceivable that HIG knowingly participated in the Board's fiduciary breaches.

In their motion to strike, Plaintiffs accuse the HIG Defendants of improperly introducing into the record an early draft of the NDA that is not referenced in the Complaint or included among the related documents. The HIG Defendants contend that the document is integral to, and was referenced in, the Complaint, and therefore may be considered on a motion to dismiss.

## II. ANALYSIS

### A. Motions to dismiss under Rule 12(b)(6)

This Court will deny a motion to dismiss under Rule 12(b)(6) "unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible to proof."[16] In determining whether the Complaint meets this pleading standard, this Court will draw all reasonable inferences in favor of the Plaintiffs, "accept all well-pleaded

---

[16] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

18

factual allegations in the Complaint as true, [and] accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim."[17] The Court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[18]

## B. Count I: the Director Defendants

Plaintiffs aver that the Director Defendants breached the fiduciary duties of care and loyalty they owed to Comverge and its stockholders.[19] Specifically, Plaintiffs allege that the Director Defendants: (1) failed to inform themselves before deciding not to bring suit against HIG for breach of the NDA; (2) conducted a flawed sale process and failed to maximize value for the Comverge stockholders; and (3) agreed to preclusive deal protection measures that prevented the Company from attracting a topping bidder. For the reasons that follow, I conclude that the Complaint fails to state a non-exculpated

---

[17] *Id.*

[18] *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011).

[19] The Complaint appears to assert claims for fiduciary breach against Comverge itself, in addition to the Director Defendants. *See* Compl. ¶ 1 ("This is a shareholder class action . . . against the Company and its former Board of Directors, for breaches of fiduciary duties . . . ."); *id.* ¶ 28 ("The Individual Defendants, Comverge, HIG, and Peak, are collectively referred to herein as 'Defendants.'"); Pls.' Answering Br. 4. Under settled Delaware law, however, "'[f]iduciary duties are owed by the directors and officers to the corporation and its stockholders.' In other words, a corporation does not owe fiduciary duties to its stockholders." *Buttonwood Tree Value P'rs, L.P. v. R.L Polk & Co.*, 2014 WL 3954987, at *4 (Del. Ch. Aug. 7, 2014). *See also Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 539 (Del. 1996). I conclude, therefore, that Comverge did not owe fiduciary duties to Plaintiffs and dismiss any claims in the Complaint to the extent they assert that the Company itself committed fiduciary breaches.

claim against the Director Defendants for breach of fiduciary duty based on the first two of those three allegations. Thus, to that extent, I dismiss Count I. As to the claim for breach of fiduciary duty based on the allegedly preclusive deal protection measures associated with the Merger Agreement, I conclude that those measures, at least collectively, conceivably are unreasonable. I therefore deny that aspect of Defendants' motions to dismiss.

### 1. The *Revlon* standard of review

It is well established that *Revlon*[20] and its progeny did not impose new fiduciary duties on boards of directors. "Rather, *Revlon* emphasizes that the board must perform its fiduciary duties in the service of a specific objective: maximizing the sale price of the enterprise."[21] The *Revlon* articulation of the duties of care and loyalty "applies only when a company embarks on a transaction . . . that will result in a change of control."[22] Where, as here, the merger consideration paid to the target stockholders is cash, *Revlon* enhanced scrutiny indisputably applies.[23]

While the intermediate level of *Revlon* enhanced scrutiny is "more exacting than the deferential rationality standard applicable to run-of-the-mill decisions governed by the business judgment rule, at bottom *Revlon* is a test of reasonableness; directors are

---

[20] *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173 (Del. 1986).

[21] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001) (internal citations omitted).

[22] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 242 (Del. 2009).

[23] *See TW Servs., Inc. v. SWT Acq. Corp.*, 1989 WL 20290, 14 Del. J. Corp. L. 1169, 1184 (Del. Ch. 1989) (Allen, C.).

generally free to select the path to value maximization, so long as they choose a reasonable route to get there."[24] In that regard, the questions before me are: (1) whether the decisionmaking process employed by the directors, including the information on which the directors based their decision, was adequate; and (2) whether the directors' actions in light of the circumstances then existing were reasonable.[25] Thus, enhanced scrutiny under *Revlon* has both subjective and objective components. Even though there is an objective reasonableness evaluation, however, *Revlon* "is not a license for law-trained courts to second-guess reasonable, but debatable, tactical choices that directors have made in good faith."[26]

## 2. It is not reasonably conceivable that the Board was improperly motivated

With respect to the initial, subjective component of enhanced scrutiny under *Revlon*, the Court's task is "to look to the directors' true intentions to determine if the directors have been motivated by the appropriate desires," namely, to achieve the highest price reasonably available to the stockholders.[27] In this case, Comverge's Board had ten directors, each of whom is a named Defendant. Of these ten directors, however, only Young, the CEO, is alleged to have been affiliated with the Company in such a way as to

---

[24] *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 595-96 (Del. Ch. 2010).

[25] *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 (Del. 1994).

[26] *See In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 830 (Del. Ch. 2011).

[27] *Koehler v. NetSpend Hldgs. Inc.*, 2013 WL 2181518, at *11 (Del. Ch. May 21, 2013).

21

raise any doubt about his disinterestedness and independence.[28] The Complaint does not allege that any of the other nine Board members were either interested or lacked independence with respect to the Merger or that the Committee or the Board was dominated or controlled by Young.

Furthermore, the Director Defendants collectively owned over 900,000 shares of Comverge stock.[29] As holders of material amounts of stock, they personally were invested in attaining the highest price available, which further supports the conclusion that their motivations were aligned with the Comverge stockholders.[30] Plaintiffs do not point to any factual allegations in the Complaint that support a reasonable inference to the contrary. Based on the record at this preliminary stage, therefore, I conclude that it is not reasonably conceivable that the actions alleged in the Complaint run afoul of the subjective component of *Revlon*'s enhanced scrutiny analysis. "Put bluntly, if the [Board] failed to maximize shareholder value, it did so, not because it or its advisors were improperly motivated, but because it made errors in judgment."[31]

---

[28] Compl. ¶ 14; April 14D-9 at I-11 ("Consistent with these considerations, and after reviewing all relevant transactions or relationships between each director . . . our Board of Directors has affirmatively determined that all of our directors, other than Mr. Young, are independent directors . . . within the meaning of the applicable Nasdaq Global Market Listing Standards.").

[29] April 14D-9, at I-43.

[30] *See Dollar Thrifty*, 14 A.3d at 600.

[31] *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1006 (Del. Ch. 2005).

22

### 3. Could the Board's actions be found objectively unreasonable?

The objective dimension of *Revlon*'s reasonableness test requires the Court to "look closely to ensure that the Board was diligently attending to its duties."[32] In this way, enhanced scrutiny goes beyond business judgment review by permitting the Court to examine the objective reasonableness of a board's decisionmaking even when the directors' subjective motivations are not in question.[33] Nevertheless, our case law is replete with warnings that this Court cannot substitute its own post-hoc judgment for that of the well-informed board acting in real time.[34] Accordingly, my focus as to this aspect of the *Revlon* analysis is on determining whether, based on the well-pled allegations in the Complaint, Plaintiffs have a reasonably conceivable possibility of prevailing on a claim that the Board's decisions were objectively unreasonable. In this regard, Plaintiffs allege, and I must consider, whether the Board: (1) failed to oversee Company management when they entered into the NDA without the Board's prior approval; (2) unreasonably entered into the Exclusivity Agreement with HIG early on in the negotiations, thereby preventing the Board from considering the $4 to $6 indication of interest from Company X; (3) conducted an unreasonable sale process that resulted in the allegedly "grossly inadequate" merger price of $1.75 per share; and (4) accepted deal

---

[32] *Dollar Thrifty*, 14 A.3d at 602.

[33] *Del Monte Foods*, 25 A.3d at 830-31 ("The reasonableness standard permits a reviewing court to address inequitable action even when directors may have subjectively believed that they were acting properly.")

[34] *See, e.g.*, *QVC*, 637 A.2d at 45 ("[A] court applying enhanced scrutiny should be deciding whether the directors made **a reasonable** decision, not **a perfect** decision.").

23

protection measures, including the Convertible Notes, a termination fee, and expense reimbursements, which, in the aggregate, conceivably precluded the possibility of a topping bid.

Having considered the parties' arguments and the record before me on Defendants' motions to dismiss, I do not find it reasonably conceivable that Plaintiffs would be able to prove that the Director Defendants committed a non-exculpated breach of fiduciary duty in the process that resulted in the HIG Merger. Hence, except as to Plaintiffs' claims relating to the challenged deal protection measures discussed in Section II.B.3.d. *infra*, I grant the Comverge Defendants' motion to dismiss. That is, the Complaint's other price and process-related fiduciary duty claims do not implicate the duty of loyalty or bad faith and, therefore, cannot state a claim against any of the exculpated Director Defendants.

### a. Entry into the NDA and exclusivity agreement

As to the specific decisions concerning entry into the NDA and then, later, the exclusivity period with HIG, I conclude that the Complaint fails to plead facts from which a non-exculpated breach of fiduciary duty conceivably could be inferred. Plaintiffs point to their assertion that Comverge executives entered into the NDA with HIG "without the express approval of the Board" as evidence of a lack of oversight on the part of the Board.[35] As alleged in the Complaint, however, it was Director Defendant Brownell who introduced Zulli to Company management, and it was Mathieson and

---

[35] Pls.' Answering Br. 32-33.

24

Director Defendant Young, the CEO, who participated in the initial talks with HIG that led to the signing of the NDA.[36] Therefore, even in the unlikely event that the theory underlying this particular challenge was sound,[37] it is not supported by the facts, because the Complaint itself alleges the involvement of at least two directors in the events surrounding Comverge's entry into the NDA.[38]

Regarding the HIG exclusivity agreement, the Board initially pushed back against HIG's demands for exclusivity.[39] Moreover, even when Comverge consented to the exclusivity in January 2012, the exclusivity period was less than 20 days long, as compared to the 30 days HIG had requested. In hindsight, the timing of the Company's agreement may have been unfortunate, because Company X indicated its $4.00–6.00 per share interest in Comverge shortly after the exclusivity period began. But *Revlon* requires reasonable decisions, not perfect ones. The Comverge Board had a firm $2.00 offer on the table, with HIG conditioning any further negotiations on the acceptance of exclusivity. Based on the facts alleged and all reasonable inferences drawn from them, I do not consider it conceivable that Plaintiffs could show that the Board's decision to

---

[36] Compl. ¶¶ 46-49.

[37] *See In re MONY Gp. Inc. S'holder Litig.*, 852 A.2d 9, 20 (Del. Ch. 2004) ("A board appropriately can rely on its CEO to conduct negotiations. . . .").

[38] I note also that the initial approach from HIG came well after the Board had authorized Comverge's management to investigate exactly these types of overtures. April 14D-9 at 3 ("At the November 23, 2010 meeting, the Company Board authorized the Company's management to pursue, with the assistance of J.P. Morgan, a confidential process by which the Company would assess potential interest regarding a minority strategic or financial investment in the Company.")

[39] Compl. ¶ 54.

accept the exclusivity period and continue their negotiations with HIG was wholly outside the range of reasonable conduct for a board seeking to maximize value for its stockholders.

### b. The Board's decision not to sue HIG

Plaintiffs contend that the Director Defendants also acted in breach of their fiduciary duties in deciding not to sue HIG once they discovered HIG had acquired the PFG Note, arguably in violation of the NDA.[40] Defendants argue that Plaintiffs failed to state a claim as to this particular conduct because, according to the Complaint itself, the Board was informed about the situation, deliberated about what to do, and made a reasonable decision not to pursue litigation against HIG at that time. Thus, Defendants suggest, the most Plaintiffs allege is that the Board made a bad business decision, which cannot give rise to a cognizable claim for fiduciary breach under these circumstances.

In the familiar context of derivative lawsuits, the starting point of the Court's analysis is that, "The decision whether to initiate or pursue a lawsuit on behalf of the corporation is generally within the power and responsibility of the board of directors."[41] The derivative context and its attendant evaluation of demand futility, however, is different from the situation in this case. Here, the decision not to sue HIG for breach of the NDA was made contemporaneously with the Board's active pursuit of strategic

---

[40] *See* Compl. §§ 8, 79-87; *see also* Pls.' Answering Br. 16-21.

[41] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009).

transactions, including a sale of the Company.[42] The purported breach of the NDA could not have occurred until February 24, 2012, when HIG purchased the PFG Note. This was only days after Comverge rejected HIG's $2.25 per share bid, and only days before it ultimately signed the Merger Agreement. In other words, the disputed decision was made while the Board and management were in the throes of their strategic negotiations involving the potential sale of the Company. Furthermore, the decision not to sue was impacted, at least in part, by deal-related considerations: according to Defendants, the Board was reasonable in "deciding that pushing hard for an effective go-shop was the better option," as compared to suing HIG.[43] In light of the timing of the decision not to sue HIG, and the fact that it is raised by both Defendants and Plaintiffs as part of the arguments for and against granting the motions to dismiss, I conclude that the Board's decision not to sue HIG for breach of the NDA should be evaluated according to the same standard as the rest of Plaintiffs' process-related *Revlon* claims, rather than as a stand-alone decision divorced from its situational context.

Applying the enhanced scrutiny standard of review to the Board's decision not to pursue litigation against HIG, I find that it is not reasonably conceivable that the Board acted in an objectively unreasonable way in this regard. Section 9 of the NDA plausibly can be read to forbid HIG from purchasing the PFG Note, but to sue HIG and prevail,

---

[42] By Defendants' own characterization of the facts, the "sale process" culminating in the HIG Merger took place over the 18-month period preceding entry into the Agreement. Comverge's Opening Br. 28.

[43] Comverge's Opening Br. 37.

27

Comverge would have had to commit resources and considerable time, neither of which the Board judged to be available. Moreover, even if Comverge had enough time and money to litigate a breach of contract claim, recovery on that claim was far from certain. This is not a breach of contract case, and I express no opinion on the likelihood that Comverge ultimately would have succeeded. To prove its case, however, Comverge would have had to prove that the PFG Note was a "security," the acquisition of which was barred by the Standstill provision in Section 9, while also proving that the broad language in Section 14—which seems to give HIG the right to acquire Comverge securities as long as it does not "violate applicable United States securities laws"—did not apply. The parties devoted considerable space in their briefs to arguing about the merits of this hypothetical contract claim. Being mindful that this matter is before me on a motion to dismiss, I consider it sufficient to have determined that non-frivolous arguments can be made both for and against the possibility that HIG's acquisition of the PFG Note violated the NDA. The Board's decision not to sue HIG, therefore, cannot conceivably be found objectively unreasonable.

In the meantime, the only bidder to have made a firm offer probably would have been lost if Comverge sued, and the Company would have faced a real possibility of bankruptcy. The Committee and the full Board met multiple times during the relevant time period from late February to early March 2012, and, according to the Complaint, they learned no later than the March 1 meeting that the PFG Note, then owned by HIG,

28

had blocking rights that potentially would impede an alternative transaction.[44]  After deliberation and in consultation with its advisors, the Board decided that, rather than sue HIG, they would contest the alleged default of the PFG Note, and continue negotiations in an effort to achieve a strategic transaction.[45]  Drawing all reasonable inferences in favor of Plaintiffs, I am convinced that although it may have been a "debatable" tactical decision not to pursue the NDA litigation strategy, it still was a reasonable decision, which this Court has no license to second-guess.[46]

### c.      The sale process and inadequate price claims

Plaintiffs' dissatisfaction with the $1.75 per share merger price and the decision to ignore Raging Capital's public letter to the Board come closer to stating a cognizable claim for breach of the Director Defendants' fiduciary duties as articulated in *Revlon*. The $1.75 per share price actually represents a discount to the unaffected market price of $1.88 per share, which itself was far below the 52-week high of $5.09 per share.[47] Indeed, Plaintiffs derisively characterize the Merger as a "takeunder" transaction.

Further, while the Board negotiated an increase in the final per-share price to $1.75 from $1.50, that came little more than a month after it had rejected a $2.25 per share offer from the same bidder as too low.  Had the Board taken the $2.25 per-share price, the equity value of the deal would have been nearly $62 million, some 28 percent

---

44      Compl. ¶¶ 78-84.

45      *Id.* ¶ 85.

46      *Del Monte Foods*, 25 A.3d at 830.

47      Compl. ¶ 110.

29

higher than the value of the actual Merger. A Comverge stockholder, or any informed observer, reasonably could wonder what happened between February 15 and March 26 that made $62 million an inadequate price for this Company on the former date but $48 million a fair price less than six weeks later. Indeed, Raging Capital's March 28 Schedule 13D letter to the Board gave voice to that sentiment.[48] Describing the deal as "a lemon," Raging Capital expressly questioned whether the Board had met its fiduciary obligations. As for the rest of the stockholder base, when the initial tender offer closed, a meager 52 percent had tendered into the deal, and even after HIG completed its subsequent offering, that number only reached 65 percent.[49]

Based on these facts, I cannot say Plaintiffs would be unable to prove a duty of care violation under any reasonably conceivable set of circumstances. Director liability for breaching the duty of care, however, is predicated upon concepts of gross negligence.[50] Our case law instructs that the core inquiry in this regard is whether there was a real effort to be informed and exercise judgment.[51] To support an inference of gross negligence, "the decision has to be so grossly off-the-mark as to amount to reckless

---

[48] As a 12 percent blockholder, Raging Capital was the largest single owner of Comverge stock at the time of the Merger. *See* April 14D-9, at I-43.

[49] *See supra* notes 13-14 and accompanying text.

[50] *McMullin v. Beran*, 765 A.2d 910, 921 (Del. 2000) (citing *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984)).

[51] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 968 (Del. Ch. 1996) ("Where a director in fact exercises a good faith effort to be informed and to exercise appropriate judgment, he or she should be deemed to satisfy fully the duty of attention.").

indifference or a gross abuse of discretion."[52]   The Merger was for a price 7.4 percent below what investors in the market were willing to pay for Comverge common stock the day before its announcement; two days after that, Comverge's largest stockholder publicly called the deal price "grossly inadequate" and accused the Board of selling the Company "for a song."   The Director Defendants' chief argument in support of their decisionmaking process is that the circumstances presented a "perfect storm" and the Board got the best deal it could.[53]   They contend that Plaintiffs' *Revlon* price and process argument "ignores the massive change in circumstances that occurred between HIG's earlier indications of interest and the later negotiations that culminated in HIG's final offer," and that shortly before assenting to the Merger Agreement, the Company "simply ran out of road."[54]   To the extent that HIG benefitted and Comverge suffered from a perfect storm, however, it was caused, at least in part, by HIG and Comverge insofar as HIG found a weakness in the PFG Note and exploited it.  Based on the record available at this motion to dismiss stage, I conclude that it is reasonably conceivable that the ultimate merger price was far enough "off-the-mark" as to implicate the fiduciary duty of care.

Nevertheless, it is undisputed that Comverge's certificate of incorporation contains an exculpation provision stating that its directors shall not personally be liable for monetary damages for breach of fiduciary duty as a director, to "the fullest extent"

---

[52]   *Solash v. Telex Corp.*, 1988 WL 3587, 13 Del. J. Corp. L. 1250, 1264 (Del. Ch. 1988) (internal citations and quotation marks omitted).

[53]   Comverge's Opening Br. 29-33.

[54]   *Id.* at 29, 30.

permitted by the Delaware General Corporation Law ("DGCL").[55] This Court has held that when such provisions exist in the corporation's certificate of incorporation, and where the relief sought is limited to damages,[56] "application of the exculpatory clause would lead to dismissal unless the Plaintiffs have successfully pleaded a failure to act loyally (or in good faith), which would preclude reliance on [the] provision."[57] So, while it does appear reasonably conceivable that the Complaint states a claim for breach of the duty of care, the allegations must implicate the non-exculpated duty of loyalty, or its subsidiary element of good faith, in order to state a *Revlon* claim.

Delaware courts have eschewed a "definitive and categorical definition of the universe of acts that would constitute bad faith," but it is illustrated, at a minimum, in cases where:

> [1] the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, [2] where the fiduciary acts with the intent to violate applicable positive law, or [3] where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.[58]

---

[55]    Comverge, Inc., Fifth Amended and Restated Certificate of Incorporation, Ex. 3.1 to Current Report (Form 8-K), at 5 (Apr. 18, 2007). This document also is attached as Ex. 9 to Comverge's Opening Brief. Plaintiffs have not objected to its authenticity.

[56]    In this case, the Merger has closed and Plaintiffs currently seek only monetary relief.

[57]    *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 664 (Del. Ch. 2013) (internal quotation marks omitted) (citing, *inter alia*, *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 239 (Del. 2009)).

[58]    *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006).

Conclusory allegations of gross negligence, without more, do not state a claim for bad faith conduct.[59] Adequately pleading bad faith conduct on the part of a director requires allegations of an "extreme set of facts" in order to give rise to the "notion that disinterested directors were intentionally disregarding their duties."[60] For this Court to conclude that Plaintiffs' Complaint adequately pleads bad faith conduct as to the sale process, it must be reasonably conceivable "that the decision to approve the Merger was so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[61]

The record in this case does not support such a conclusion. Here, while hindsight may suggest that the Board should have, could have, or would have obtained a better price if they had made certain decisions differently, when viewed from the perspective of the circumstances they faced, the Board's conduct cannot conceivably rise to the level of "utterly fail[ing] to attempt to obtain the best sale price."[62] Based on the facts as alleged in the Complaint and recited in the 14D-9, the Board engaged in an over 18-month strategic process before agreeing to the Merger. During that time it formed a disinterested and independent Transaction Committee, hired financial and legal advisors, held numerous meetings, widely canvassed the market of potential participants, and

---

[59] *See id.* at 66.

[60] *Lyondell*, 970 A.2d at 243.

[61] *In re Alloy, Inc.*, 2011 WL 4863716, at *10 (Del. Ch. Oct. 13, 2011).

[62] *Lyondell*, 970 A.2d at 244.

33

considered alternatives to selling the entire company, such as obtaining a minority equity investment and restructuring the Company's debt.

With respect to HIG, the Board pushed back and showed it was willing to say no, engaging in hard-fought negotiations over a period of months. Before assenting to the Merger Agreement, the Committee obtained a fairness opinion from Houlihan, and convinced HIG to raise the price and agree to a go-shop period. Even after HIG acquired the PFG Note and was approaching checkmate, the Board took reasonable steps to maximize value for the Comverge stockholders within the confines of the difficult new situation it faced. It is reasonable to infer that HIG obtained the upper hand in its negotiations with Comverge as a result of having the PFG Note. In so doing, HIG likely outmaneuvered Comverge and enabled itself to buy the Company at a price substantially below what HIG was willing to pay only a month earlier. Conversely, the Board and Company management may have made some poor moves or decisions in allowing themselves to be placed in such a predicament. The record indicates, however, that the Board was highly engaged in the process, and this type of engagement precludes a finding of bad faith conduct.[63] "[C]laims of flawed process are properly brought as duty

---

[63] *See, e.g.*, *Del Monte Foods*, 25 A.3d at 830 ("Time-bound mortals cannot foresee the future. The test therefore cannot be whether, with hindsight, the directors actually achieved the best price. 'Rather, the duty can only be to try in good faith, in such a setting, to get the best available transaction for the shareholders. Directors are not insurers.'") (quoting *Citron v. Fairchild Camera & Instrument Corp.,* 1988 WL 53322, at *16 n.17 (Del. Ch. May 19, 1988) (Allen, C.)).

of care, not loyalty, claims and, as discussed, those claims are barred" by exculpation provisions adopted in conformity with 8 *Del. C.* § 102(b)(7).[64]

### d. The Board's acceptance of certain deal protection measures

Plaintiffs' final *Revlon*-related argument is that, in connection with the Merger Agreement, the Board accepted several deal protection devices that effectively precluded a topping bid from emerging during the go-shop period. Specifically, they challenge: (1) the length of the go-shop period; (2) the top-up option; and (3) the termination fee.

Plaintiffs' challenge to the top-up option is without merit. A top-up option is a device commonly used by transactional planners and not one that conceivably could be called unreasonable in itself when conditioned on the attainment of a majority of the shares in a public tender offer.[65] Further, in the time since this Merger closed, the Delaware General Assembly essentially has approved this transactional structure by adding a provision to the DGCL that facilitates the ability of the acquirer in a two-step acquisition like this one to use a short-form back-end merger without resorting to a top-up option.[66]

---

[64] *In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *7 (Del. Ch. Sept. 30, 2009).

[65] *See In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 505-08 (Del. Ch. 2010).

[66] *See* 8 *Del. C.* § 251(h); 2013 Del. Laws ch. 72, § 6 (2013); *see also* EDWARD P. WELCH ET AL., FOLK ON THE DELAWARE GENERAL CORPORATION LAW (6th ed. 2014) § 251.07[T] ("Section 215(h), added in 2013, permits merger agreements entered into after August 1, 2013 to contain a provision eliminating the need for a stockholder vote for a second-step merger following consummation of a tender or exchange offer if certain conditions are met.").

I turn, therefore, to the go-shop period and the termination fee. A go-shop of 30 days with the possibility of a 10-day extension, like the one agreed to here, is within the range of typical go-shop periods.[67] I note also that the case law places more emphasis on the length of a post-signing go-shop if there was not an effective market check before signing.[68] Comverge actively had engaged in a search for strategic transactions for some 18 months before the Merger Agreement. During that time, the Board and its financial advisors canvassed the market and entered confidentiality agreements with numerous strategic and financial buyers. These facts suggest that the Board and the Committee had sufficient time to ascertain whether any interested parties were waiting in the wings. Considered in isolation, therefore, it seems inconceivable to me that the length of the go-shop period here would be found unreasonable.

The trouble for the Comverge Defendants is that a post-signing market check of the length they used or longer is useless if the termination or break-up fee structure is preclusive in nature. The Merger Agreement provided for a two-tier termination fee: Comverge would pay HIG $1.206 million if the Company entered into a superior transaction during the go-shop period, and $1.93 million after the go-shop expired. Additionally, Comverge agreed to reimburse HIG for expenses up to $1.5 million under

---

[67]  *See, e.g.*, *MONY*, 852 A.2d at 23 ("Market checks brought before this court typically last between one and two months.").

[68]  *See In re Topps Co. S'holders Litig.*, 926 A.2d 58, 86 (Del. Ch. 2007) (noting that it was "critical" to the Court's determination that the target board had not done a pre-signing market check, but did secure a 40-day go-shop period.)

either scenario.[69] If the lower of the termination fees were used, the total payable to HIG would be 5.55% of the deal's equity value and 5.2% of its enterprise value; using the higher of the fees, those percentages would be 7% and 6.6%, respectively.[70] At the motion to dismiss stage, drawing all reasonable inferences in favor of Plaintiffs, I cannot rule out the possibility that the higher end of those figures might apply. Even assuming the lesser 5.55% metric is used, however, that percentage tests the limits of what this Court has found to be within a reasonable range for termination fees.[71] This is true even for a micro-cap acquisition like this one (approximately $48 million), – situations in which the case law tends to provide somewhat greater latitude in this regard.[72]

---

[69] Compl. ¶ 104.

[70] *Id.*; *see also* Comverge's Opening Br. 43. As between the equity and enterprise value metrics, this Court sometimes finds the latter to be more informative "[f]or purposes of considering the preclusive effect of a termination fee on a rival bidder," especially in the context of a highly leveraged target company, "because . . . most acquisitions require the buyer to pay for the company's equity and refinance all of its debt." *In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 120 (Del. Ch. 2007). According to Plaintiffs' allegations in this regard, which Defendants do not challenge, the equity and enterprise values of the HIG–Comverge Merger are similar enough that the decision to use one or the other will not be material to my determination as to whether the termination fee structure in this case conceivably is unreasonable. Therefore, in the interest of brevity, I will refer only to equity value for purposes of this analysis.

[71] *See, e.g.*, *In re Answers Corp. S'holders Litig.*, 2011 WL 1366780, at *9 (Del. Ch. Apr. 11, 2011) (calling termination fee of 4.4% of equity value "near the upper end of a 'conventionally accepted' range"); *Topps*, 926 A.2d at 86 (calling termination fee of 4.3% of equity value "a bit high in percentage terms").

[72] *See, e.g.*, *Answers*, 2011 WL 1366780, at *9 (noting that, in the context of a relatively "small" transaction, a "somewhat higher than midpoint on the 'range' is not atypical"); *Topps*, 926 A.2d at 86 (stating that the relatively high termination fee was "explained by the relatively small size of the deal").

The more difficult question is whether I should include the Convertible Notes in the termination fee analysis. As noted above, the Convertible Notes were executed in conjunction with the Merger Agreement, and were the vehicle by which HIG provided Comverge with $12 million in bridge financing.[73] Plaintiffs argue that, in practical terms, the Notes' conversion privilege could result in a $3 million payment to HIG if Comverge entered into a superior transaction, and therefore should be added to the termination fee and the expense reimbursement. In that case, the total "termination" payment easily could be at least $5.7 million during the go-shop period and $6.43 million afterward, amounting, respectively, to 11.6% or 13.1% of the equity value of the transaction.[74] Under the Note Purchase Agreement, the Convertible Notes may be converted into 8,571,428 shares of Comverge common stock at a conversion price of $1.40 per share.[75] Plaintiffs' argument is that, if a topping bidder were to emerge, they would have to offer at least $1.76 per share to beat HIG's offer. If HIG elected to convert the Notes into equity and then tender into the superior offer, it would net 36 cents per share. In that hypothetical case, the topping bidder would have to pay $3.085 million more to acquire Comverge than the roughly $48 million price HIG had negotiated, and that extra amount would go into HIG's pocket. Plaintiffs contend that amount should be taken into account

---

[73] Compl. ¶¶ 101, 105. The Convertible Note agreement, referred to in the April 14D-9 as the "Note Purchase Agreement," is Ex. 10.1 to the Comverge, Inc., Current Report (Form 8-K) (Mar. 26, 2012), incorporated by reference as Ex. (e)(3) to the April 14D-9.

[74] Compl. ¶ 105; Pls.' Answering Br. 26.

[75] Compl. ¶ 105.

along with the termination fees as part of the cost to the topping bidder of simply getting into the game. That would make the total "termination payment" soar to as much as 13% of equity value of the transaction or more.

Defendants have not cited any case under Delaware law where a break-up fee at that level has been found within a range of reasonableness; rather, they argue that it would be a mistake to consider the conversion feature of the Notes alongside the termination fees.[76] In addition, Defendants assert that, in any event, the Company so badly needed liquidity that the Convertible Notes cannot be seen as anything other than reasonable under the circumstances.[77] It is difficult to evaluate Defendants' first argument on the preliminary record before me. At the motion to dismiss stage, the relevant inquiry is whether it is reasonably conceivable that the Convertible Notes could have functioned, in effect, as part of an unreasonably high termination fee, not whether the Notes conclusively did so in this case.[78]

---

[76] HIG Defs.' Reply Br. ("HIG's Reply Br.") 18.

[77] Comverge Defs.' Reply Br. ("Comverge's Reply Br.") 25-26.

[78] At oral argument, I questioned counsel for the Comverge Defendants regarding a factual argument in the HIG Reply Brief that suggested that HIG would receive **either** the termination fee and reimbursement of expenses, **or** the premium resulting from the conversion privilege in the Notes. Specifically, I asked if this "either/or" proposition was correct. Counsel for the Comverge Defendants answered that, "I don't believe it's an either/or situation, but we don't believe that that . . . should be considered a termination fee and should make it unreasonable. The fact of the matter is, [Comverge] is a company that had been losing money, had debt, and in order to get additional capital, had to agree to a loan that had convertibility features in it . . . ." Arg. Tr. 19-20. Addressing this same point, counsel for HIG stated, "It admittedly is a complicated argument, because it depends on the interplay of the merger agreement and the forbearance agreement

The provision regarding the conversion privilege in the Note Purchase Agreement governing the Convertible Notes is complicated and incorporates several sections of the Merger Agreement.[79] Based on my preliminary reading of that provision and the relevant sections of the Merger Agreement and the Forbearance Agreement,[80] I cannot rule out the possibility that the Convertible Notes would exacerbate the effect of the termination fee, as Plaintiffs suggest it would. Although it is unclear whether Plaintiffs ultimately will prevail on this particular point after a more complete development of the facts and the applicable legal principles, drawing all inferences in favor of Plaintiffs, it is reasonably conceivable at this stage that the Convertible Notes theoretically could have worked in tandem with the termination fees effectively to prevent a topping bid.

This conclusion is buttressed by the fact that, as the relevant events were unfolding, Comverge's largest stockholder, Raging Capital, expressed its understanding of the interplay between the Merger Agreement and the Convertible Notes by stating that, "[W]e view this bridge loan as essentially a second break-up fee designed to have a chilling effect on the ability of a third-party to submit a competing bid."[81] This Court

and the [note] purchase agreement. But as we understood it, those two things shouldn't be stacked on – it was an either/ or." *Id.* at 35. *See also* Comverge's Reply Br. 27 ("[T]he Note Purchase agreement[] allowed HIG to convert the $12 million note into stock if the Company terminated the merger agreement.").

[79]   *E.g.*, Note Purchase Agreement § 2. *See generally* William Wilson Bratton, *The Economics and Jurisprudence of Convertible Bonds*, 1984 Wisc. L. Rev. 667 (1984).

[80]   *See* Bayliss Aff. Ex. 9 (the "Forbearance Agreement").

[81]   Compl. ¶ 113.

40

previously has observed that: "The preclusive aspect of any termination fee is properly measured by the effect it would have on the desire of any potential bidder to make a topping bid."[82] When making such a determination under the enhanced scrutiny of *Revlon*, the proper inquiry "examines whether the board granting the deal protections had a reasonable basis to accede to the other side's demand for them in negotiations."[83] In conducting that examination, cases like *Louisiana Municipal Police Employees Retirement System v. Crawford* instruct that the Court should consider all of the facts and circumstances relevant to the board's decision.[84] Specifically, this Court must:

> consider a number of factors, including without limitation: the overall size of the termination fee, as well as its percentage value; the benefit to shareholders, including a premium (if any) that directors seek to protect; the absolute size of the transaction, as well as the relative size of the partners to the merger; the degree to which a counterparty found such protections to be crucial to the deal, bearing in mind differences in bargaining power; and the preclusive or coercive power of *all* deal protections included in a transaction, taken as a whole.[85]

Having conducted such an examination, I conclude that it is reasonably conceivable that the Director Defendants acted unreasonably in agreeing to the potentially preclusive termination fees and the Convertible Notes. In reaching that conclusion, I consider it reasonable to infer at this point that the Convertible Notes may

---

[82] *Dollar Thrifty*, 14 A.3d at 613.

[83] *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1016 (Del. Ch. 2005).

[84] *La. Mun. Police Employees' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1181 n.10 (Del. Ch. 2007).

[85] *Id*.

41

have been viewed by potential bidders as additional termination fees, which effectively would bring the total termination payments to over $6 million, resulting in a termination fee of 13% of the equity value of the transaction. These potential findings of unreasonable deal protection measures are cause for legitimate concern, particularly in the context of a deal with a *negative* premium to market. This circumstance distinguishes this case from many in which this Court has not questioned the reasonableness of similar deal protection devices.[86]

Another factor identified by Chancellor Chandler in the *Crawford* case, the parties' relative bargaining power, similarly militates in favor of finding the termination fee structure here problematic. If HIG had wanted to extract more potent deal protections than reasonably were called for, Comverge was ill-positioned to resist. As discussed above, HIG's control of the PFG Note gave it negotiating leverage to put Comverge up against the ropes. In the Director Defendants' own words, Comverge "simply ran out of road" and essentially had to choose between the HIG Merger and bankruptcy.[87] The Board apparently considered the potentially preclusive effect that the Convertible Notes

---

[86] *See*, *e.g.*, *Dollar Thrifty*, 14 A.3d at 610-11; *Toys "R" Us*, 877 A.2d at 1008-20.

[87] Comverge's Opening Br. 30-31. I note, for example, that Houlihan's financial analysis looked at the value of the HIG offer as compared to Comverge's standalone value in a bankruptcy scenario. The evidence ultimately may show that the Board reasonably thought the Company would be facing bankruptcy if it turned down HIG yet again.

might have had,[88] but in the end yielded to HIG's superior bargaining position and simply accepted any such effect.

Based on all these factors, I conclude that the combined effect of the termination fees, the expense reimbursement provision, and the Convertible Notes conceivably could have had an unreasonably preclusive effect on potential bidders who might otherwise have topped HIG's offer and provided greater value to the Comverge stockholders.[89] Notwithstanding this conclusion, as with the price and process claims discussed above, under the Section 102(b)(7) exculpation provision, the Director Defendants would be "entitled to dismissal unless the [P]laintiffs have pled facts that, if true, support the conclusion that the [Defendant Directors] failed to secure the highest attainable value as a

---

[88] April 14D-9 at 20 ("The Committee considered the termination fees and expense reimbursement requirements that would make it more costly for another potential purchaser to acquire the Company. . . . [and] considered the terms of the $12 million bridge loan being provided to the Company by [HIG] . . . and the possibility that those terms may have the effect of discouraging other potential purchasers from making a competing proposal to acquire the Company.").

[89] In arguing for a contrary conclusion as to the reasonableness of the deal protection measures, Defendants rely in part on this Court's May 8, 2012 ruling on Plaintiffs' motion to preliminarily enjoin the Merger. *See* HIG's Opening Br. 21; HIG's Reply Br. 19-20; Comverge's Reply Br. 25. Under Delaware law, however, "The pleadings stage test standard is lower than the merits-focused element of the preliminary injunction standard, which requires that the plaintiff show a reasonable probability of success on the merits. This court's prior comment during its ruling on an application for preliminary injunction that the plaintiffs had not shown a reasonable probability of success on the merits . . . does not dictate the outcome of a pleadings-stage motion." *OTK Assocs., LLC v. Friedman*, 85 A.3d 696, 725 (Del. Ch. 2014).

result of their own bad faith or otherwise disloyal conduct."[90]   Unlike the price and process claims, however, Plaintiffs' claim relating to the termination fees appears, at this preliminary stage, sufficient that it conceivably could overcome Comverge's exculpation provision.  I reach this conclusion on the grounds that, if the Convertible Notes are taken as contributing to the preclusive effect of the termination fee and the expense reimbursements, it conceivably is true that the Board's apparently passive acceptance of those terms without any pushback was "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[91]   The aggregate value of those termination payments reaches approximately 13% of the equity value of the transaction, well more than double the termination fee percentages that this Court has found to be at the upper bounds of reasonableness.[92]

For these reasons, therefore, I deny the Comverge Defendants' motion to dismiss Count I for breach of fiduciary duty to the limited extent that, based on the record currently before me, I cannot rule out the possibility that the termination fee structure

---

[90]   *In re BJ's Wholesale Club, Inc. S'holders Litig.*, 2013 WL 396202, at *6 (Del. Ch. Jan. 31, 2013) (quoting *McMillan v. Intercargo Corp.,* 768 A.2d 492, 502 (Del. Ch. 2000)).

[91]   *BJ's Wholesale Club*, 2013 WL 396202, at *8.

[92]   *See, e.g.*, *Koehler*, 2013 WL 2181518, at *24 (citing *Dollar Thrifty*, 14 A.3d at 614; *Answers*, 2011 WL 1366780, at *4); *see also Phelps Dodge Corp. v. Cyprus Amax Minerals Co.*, 1999 WL 1054255, at *2 (Del. Ch. Sept. 27, 1999) (stating that a termination fee of 6.3 percent "certainly seems to stretch the definition of range of reasonableness and probably stretches the definition beyond its breaking point," although ultimately declining to rule on that issue in the context of a preliminary injunction motion where plaintiffs had failed to demonstrate likelihood of irreparable harm).

44

associated with the Merger Agreement, including the Convertible Notes, was unreasonable.

### C.      Count II: the HIG Defendants

Plaintiffs' second cause of action is against the HIG Defendants for aiding and abetting the Comverge Defendants' fiduciary breaches. "A third party may be liable for aiding and abetting a breach of a corporate fiduciary's duty to the stockholders if the third party 'knowingly participates' in the breach."[93] At the motion to dismiss stage, an aiding and abetting claim is well-pled if the Complaint alleges non-conclusory facts that satisfy four elements: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; (3) knowing participation in that breach by the defendants; and (4) damages.[94] The HIG Defendants' motion to dismiss the aiding and abetting claim rests on two arguments: (1) that there was no underlying breach of fiduciary duty by the Board, and therefore there can be no aiding and abetting liability; and (2) that even if there were an underlying fiduciary breach, the Complaint does not allege sufficient facts from which a fact-finder reasonably could infer that the HIG Defendants "knowingly participated" in any such breach.

Having ruled in the previous Section of this Memorandum Opinion that it is reasonably conceivable the Comverge Board breached its duty of care[95] and possibly

---

[93]     *Malpiede*, 780 A.2d at 1096.

[94]     *Id.*

[95]     That the Director Defendants are exculpated from liability for any breaches of the duty of care does not mean there is no underlying fiduciary breach for purposes of

45

acted in bad faith in approving deal protection measures in connection with the Merger that were impermissibly preclusive, I turn to the issue of whether the HIG Defendants knowingly participated in that breach. The HIG Defendants contend that because HIG and Comverge were adversarial negotiating parties, HIG cannot have "knowingly participated," as a matter of law, in any predicate fiduciary breach the Board may have committed. Plaintiffs counter that the Complaint pleads facts from which knowing participation reasonably can be inferred, principally with regard to HIG's acquisition of the PFG Note, potentially in violation of the NDA, and its subsequent use of that Note to obtain negotiating leverage in its pursuit of Comverge. Based on HIG's superior bargaining position, Plaintiffs deny that the negotiations between HIG and Comverge were "arm's-length." Plaintiffs therefore contend that the facts alleged in their Complaint support their claim that HIG brought about the Board's fiduciary breaches.

Proving liability under an aiding and abetting theory "largely come[s] down to what constitutes 'knowing participation.'"[96] In at least one case, this Court has suggested

---

Plaintiffs' aiding and abetting claim. *See In re Rural Metro Corp.*, 88 A.3d 54, 97 (Del. Ch. 2014) ("This court has recognized that a third party can be liable for aiding and abetting, even if the Board breached only its duty of care.") (internal quotation marks omitted).

[96] *Carlton Inv. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *15 (Del. Ch. Nov. 21, 1995). In *Carlton*, Chancellor Allen denied a motion to dismiss aiding and abetting claims brought against TLC Beatrice's controlling stockholder and several entities he owned, because one of those entities allegedly acted "as middleman for and beneficiary of improper disbursements by TLC Beatrice," which led the Chancellor to find that the controlling stockholder was "inextricably intertwine[d] with the defendant directors in this action for breach of fiduciary duties." *Id.*

46

that this element of the aiding and abetting test "requires an understanding between the parties 'with respect to their complicity in any scheme to defraud or in any breach of fiduciary duties.'"[97]

This Court also has suggested, however, that aiding and abetting liability may exist in situations not rising to the level of a subjective understanding of "complicity" between the fiduciary and the aider-and-abettor in a scheme involving the breach of a duty. Specifically, Delaware courts have found aiding and abetting liability "when a third party, for improper motives of its own, *misleads* the directors into breaching their duty of care."[98] In the *Mills Acquisition Co.* case, the perpetrator of such a "fraud upon the board"[99] was the self-interested management of the target who steered the board's sale process toward its favored private equity buyer, at the stockholders' expense.[100] In

---

[97]    *Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *28 (Del. Ch. Jan. 25, 1999) *aff'd*, 741 A.2d 16 (Del. 1999) (quoting *Carlton Inv.*, 1995 WL 694397, at *15 n. 11).

[98]    *Rural Metro*, 88 A.3d at 99 (emphasis added).

[99]    *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283 (Del. 1989). I note that although the *Mills Acquisition* case itself did not involve aiding and abetting liability, this Court has applied the teaching of that case in the aiding and abetting context. *See Del Monte Foods*, 25 A.3d at 836. As discussed further in this section, the *Mills Acquisition* case is informative in this regard because of its reasoning that even a disinterested and independent director's decision "cannot survive" if it "was not informed or was induced by breaches of fiduciary duties." *Mills Acq.*, 559 A.2d at 1284. "[I]t is bedrock law that the conduct of one who knowingly joins with a fiduciary, including corporate officials, in breaching a fiduciary obligation, is equally culpable." *Id.* at 1284 n. 33.

[100]   *Mills Acq.*, 559 A.2d at 1283-84 ("[W]hen a board is deceived by those who will gain from such misconduct, the protections girding the decision itself vanish. Decisions made on such a basis are voidable at the behest of innocent parties to

47

the *Del Monte Foods* case, the "taint of self-interest came from a conflicted financial advisor rather than from management"[101] and extended to the acquirer that had conspired with the conflicted financial advisor.[102] Arguably falling between these two cases in terms of the scope of "knowing participation" for aiding and abetting liability is this Court's recent *In re Rural Metro* decision, in which the target company's financial advisor knowingly participated in breaches of the duty of care by members of the board because the advisor had "*created* the unreasonable process and informational gaps that led to the Board's breach of duty."[103] These cases are similar in the critical sense that the third party aider-and-abettor possessed the requisite degree of *scienter* or "knowing participation," because the factual record "point[ed] to evidence of a conflict of interest diverting the advisor's loyalties from its client, such that the advisor, like the bankers in *Del Monte* and *El Paso,* is being paid in some fashion something he would not otherwise get in order to assist in the breach of duty."[104]

---

whom a fiduciary duty was owed and breached, and whose interests were thereby materially and adversely affected. This rule is based on the unyielding principle that corporate fiduciaries shall abjure every temptation for personal profit at the expense of those they serve.") (citing *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (1939)).

[101] *Del Monte Foods*, 25 A.3d at 836.

[102] *Id.* at 837.

[103] *Rural Metro*, 88 A.3d at 99.

[104] *Id.* at 100 (internal citations and quotation marks omitted). *See also id.* at 91 n.17 (citing, *inter alia*, *Mills Acq.*, 559 A.2d at 1283-84; *Del Monte Foods*, 25 A.3d at 833-35); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1058 (Del. Ch. 1984) (denying summary judgment where a triable factual issue existed concerning whether the acquiring company conspired with the target board to achieve a lower sale price in exchange for side benefits to the directors), *aff'd*, 575 A.2d 1131 (Del. 1990).

These cases stand in contrast to many others that have rejected aiding and abetting claims as a matter of law, primarily because in the latter category of cases there was no comparable evidence of an abuse of trust by the third-party aiders-and-abettors vis-à-vis the corporate fiduciaries. The most typical example of such failed aiding and abetting claims is when a third-party acquirer is accused of aiding and abetting fiduciary breaches by the target board. In those situations, this Court has adhered to the rule that "a bidder's attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting," so long as the bidder does not induce the target's fiduciaries to sell out the target's stockholders by creating or exploiting self-interest on the part of the fiduciaries.[105] This prevailing rule, that arm's-length bargaining cannot give rise to aiding and abetting liability on the part of the acquirer, is well supported by both logic and our law, as it "helps to safeguard the market for corporate control by facilitating the bargaining that is central to the American model of capitalism."[106] In a merger between two corporations, both sets of negotiating parties have a duty to seek the best deal available for the residual claimants they represent. To allow the stockholders of either side to state a claim against the other "simply by making a cursory allegation that the bidder got too good a deal is fundamentally inconsistent with the market principles with which our corporate law is designed to operate in tandem."[107]

---

[105] *Malpiede*, 780 A.2d at 1097 (Del. 2001) (citing, *inter alia*, *Gilbert*, 490 A.2d at 1058).

[106] *Morgan v. Cash*, 2010 WL 2803746, at *8 (Del. Ch. July 16, 2010).

[107] *Id.*

Taking the facts alleged in the Complaint as true, and drawing all reasonable inferences in favor of Plaintiffs, I conclude that this case falls in the latter category wherein the purported claim for aiding-and-abetting liability should fail as a matter of law. This is not a situation in which HIG as the third-party bidder "attempt[ed] to create or exploit conflicts of interest in the board," nor did HIG as the bidder "conspire in or agree to the fiduciary breach" of the board.[108] Moreover, HIG did not act in this case as a sort of "gatekeeper"[109] that the Comverge Board reasonably would have considered as having interests in line with those of Comverge.

HIG approached Comverge about negotiating a merger, and the Board reacted accordingly by executing a contract in which the parties' memorialized the terms that would govern their arm's-length bargaining process: the NDA. Thereafter, the parties engaged in arm's-length negotiations that bordered, at times, on becoming hostile. Plaintiffs emphasize the fact that HIG arguably breached the NDA and then used its acquisition of the PFG Note as the critical tool to pin down the Comverge Board and extract a low-ball sale at $1.75 per share. The premise of this argument is Plaintiffs' charge that HIG breached the NDA, and that breach of contract claim may be colorable. The Board, however, made a real time decision not to pursue such a claim based on a multitude of pressing considerations. While potentially debatable, that decision falls

---

[108]   *Del Monte Foods*, 25 A.3d at 837.

[109]   *See Rural Metro*, 88 A.3d at 88 ("Directors are not expected to have the expertise to determine a corporation's value for themselves, or to have the time or ability to design and carry out a sale process. Financial advisors provide these expert services. In doing so, they function as gatekeepers.").

within a range of reasonable actions that the Board might have taken under the circumstances.

The hard-nosed and aggressive nature of HIG's acquisition strategy, however, cannot give rise to aiding and abetting liability where there are no well-pled facts suggesting that someone associated with HIG that the Comverge Board was supposed to trust—*e.g.*, management or a financial advisor—abused that trust to the detriment of the Company's stockholders. HIG and Comverge never had that kind of a relationship, and that is not surprising for the reasons stated in *Morgan v. Cash*, discussed *supra*.[110] "An acquirer is free to seek the lowest possible price through arms' length negotiations," provided that the acquirer may not induce the target directors to breach their fiduciary duties "by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders."[111] The Complaint includes no allegation that HIG engaged in the type of side-dealing with Comverge's fiduciaries that our case law has recognized would give rise to aiding and abetting liability on the part of a third-party acquirer.[112]

---

[110]  *See supra* notes 106-07 and accompanying text.

[111]  *Del Monte Foods*, 25 A.3d at 837.

[112]  *See, e.g.*, *Morgan*, 2010 WL 2803746, at *6 ("*Gilbert* and *Zirn* differ materially from this case because, in both of those cases, the complaint alleged facts suggesting how and why the acquiror actually used its knowledge of the target board's conflicts *to collude with the target board at the expense of the target's shareholders*. That is, the term 'exploit' as used in this context connotes the 'unjust' or 'improper' use of someone else for profit. *Thus, 'exploit' refers to a situation, as in Gilbert and Zirn, where a bidder gets a fiduciary to trade away his trust for personal advantage as a means to further the bidder's aims.*") (emphases added) (citing *Gilbert*, 490 A.2d 1050; *Zirn v. VLI Corp.*, 1989 WL 79963 (Del. Ch. July 17, 1989)).

Plaintiffs would have this Court find that because HIG allegedly got the better of Comverge at the negotiating table, those negotiations were not at "arm's-length."[113] To accept this contention would impose upon HIG duties that it never agreed to assume and distort the meaning of "arm's-length."[114] The arm's-length bargaining between HIG and Comverge is not called into question merely because Plaintiffs are unhappy with the price HIG ultimately paid for Comverge's common stock.[115] As discussed above, HIG's acquisition and subsequent use of the PFG Note, while arguably suspect, appears to have been consistent with a colorable reading of the NDA. This fact severely undermines Plaintiffs' conclusory suggestion that HIG was acting in bad faith or with a malicious intent in pursuing the course of action it did. In this regard, HIG and Comverge's situation is similar to that presented in the *Malpiede* case, in which the Supreme Court held that a claim for aiding and abetting against a bidder failed as a matter of law, notwithstanding that the bidder "(1) initially misrepresented the nature of its interest in the [target's] shares, (2) threatened to sue the board . . ., (3) demanded a hasty consummation of the [m]erger, and (4) conditioned [the] offer on the board's acceptance of extremely restrictive contract terms."[116] As in *Malpiede*, I conclude that, "Although

---

[113] Pls.' Answering Br. 47-48.

[114] *See* BLACK'S LAW DICTIONARY (9th ed. 2009) (defining "arm's-length" as, "Of or relating to dealings between two parties who are not related or not on close terms and who are presumed to have roughly equal bargaining power; not involving a confidential relationship").

[115] *See Morgan*, 2010 WL 2803746, at *8.

[116] *Malpiede*, 780 A.2d at 1096.

[the acquirer's] tactics here, as alleged, may have been somewhat suspect . . . the plaintiffs' aiding and abetting claim fails as a matter of law because the allegations in the complaint do not support an inference that [the acquirer] knowingly participated in a fiduciary breach."[117]  "In summary, [Plaintiffs'] argument fails because *Malpiede*'s requirement that the third party knowingly participate in the alleged breach—whether by buying off the board in a side deal, or by actively exploiting conflicts in the board to the detriment of the target's stockholders—is there for a reason."[118]

## D.    Plaintiffs' Motion to Strike

Plaintiffs moved to strike an exhibit filed by the HIG Defendants' in support of their motion to dismiss.  The challenged document apparently was a preliminary draft or version of the NDA ultimately executed by HIG and Comverge in November 2011.[119]  In reaching the conclusions set forth in this Memorandum Opinion, I have not relied on that document in any respect.  In fact, I have not found it necessary or advisable to address at all the issue of whether the NDA actually was breached, which ostensibly is the issue for which the HIG Defendants proffered the document in the first place.  For these reasons, I consider Plaintiffs' motion to strike to be moot.

## III.    CONCLUSION

For all of the reasons stated in this Memorandum Opinion, I grant in part and deny in part the Comverge Defendants' motion to dismiss and grant entirely the HIG

---

[117]    *Id.* at 1098.

[118]    *Morgan*, 2010 WL 2803746, at *8.

[119]    The challenged document is in the record as Bayliss Aff. Ex. 2.

Defendants' motion to dismiss.  In particular, the Complaint is dismissed in its entirety as to Comverge, Inc., and is dismissed as to the Director Defendants except as it relates to Plaintiffs' claim for breach of fiduciary duties based on the Merger Agreement's termination fees and expense reimbursement, and the Convertible Notes considered in the aggregate.  The Complaint is dismissed in its entirety as to the HIG Defendants.  Lastly, Plaintiffs' motion to strike is denied as moot.

**IT IS SO ORDERED**.